ASAHEL S. LEVY and Another, Executors, &c., OF URIAH P.
  LEVY, Deceased, *v.* VIRGINIA LEVY and Others.

Where the whole scheme of a charitable trust in a will is founded upon the
  assumed validity of a devise therein of a certain farm in Virginia, such devise
  being void as against the laws of Virginia, no part of the charitable trust can
  be sustained.

*It seems,* that to raise a trust at common law, there must be a definite grantee,
  devisee or donee, capable of coming into court and claiming the benefit of the
  grant, devise or bequest. Per WRIGHT, J.

At common law, when the trust is for an uncertain object, the property which
  is the subject of the trust is deemed to be undisposed of, and goes to those to
  whom the law gives the ownership in default of disposition by the former
  owner. Per WRIGHT, J.

But the doctrine was held to be otherwise in respect to "charitable trusts."

The question whether the doctrines of trusts for charitable uses in England,
  extended and strengthened by the prerogative of the crown, and the statute
  of 43 Elizabeth, are applicable in this State, discussed by WRIGHT, J.

That peculiar system of English jurisprudence for supporting, regulating and
  enforcing public or charitable uses, void by the rules of common law, not
  deemed to be in force in this State. Per WRIGHT, J.

The cases of *Williams* v. *Williams* (8 N. Y., 525), and *Owens* v. *The Missionary
  Society of the Methodist Episcopal Church* (14 N. Y., 380), examined by
  WRIGHT, J.

THE action was by the acting executors of Uriah P. Levy
deceased, to obtain a judicial construction of parts of his
will.

The testator was domiciled and died in the city of New
York, in March, 1862, leaving a widow surviving him, and
brothers and sisters, nephews and nieces, his heirs-at-law and
next of kin. At his death, he owned real estate in the city
of New York, valued at $200,000, and his personal estate
was inventoried at $131,000. He also had a farm at Monti-
cello, in the State of Virginia, consisting of between 2,000
and 3,000 acres, and another estate, called the "Washington
farm," of about 1,100 acres, with implements, cattle, &c.

By his will, after sundry devises and bequests, the testator
gave his farm and estate at Monticello, "together with all

the rest and residue of his estate, real, personal or mixed," " to the people of the United States, or such persons as congress shall appoint to receive it, *in trust* for the sole and only purpose of establishing and maintaining at said farm of Monticello, in Virginia, an agricultural school for the purpose of educating, as practical farmers, children of the warrant office of the United States navy whose fathers are dead," &c. "Should the congress of the United States refuse to accept of this bequest, or refuse to take the necessary steps to carry out this (the testator's) intention," then it is given " to the people of the State of Virginia, instead of the people of the United States, provided they, by acts of their legislature, accept it and carry it out as herein directed." "And should the people of Virginia, by neglect of their legislature, decline to accept the said bequest," then it is given to certain Hebrew congregations, in the cities of New York, Philadelphia and Richmond, "*provided* they procure the necessary legislation to entitle them to hold said estate, and to establish an agricultural school at said Monticello, for the children of said societies, who are between the ages of twelve and sixteen years, and whose fathers are dead, and also similar children of any other denomination, Hebrew or Christian."

The management and disposition of the estate thus devised and bequeathed, are determined by the will as follows : " The institution must be kept within the revenue derived from this endowment, and under no circumstances can any part of the real or personal estate hereby devised be disposed of; but the rent and income of all said estate, real and personal, is to be held forever inviolate for the purpose of sustaining this institution. The estate and lands in New York can be leased to great advantage for that purpose," &c.

The testator further provided, that his executors should "invest the funds arising from said estate in some safe paying stocks, as fast as they accumulate, and hold ' the whole of the property devised and bequeathed for said school, and in their hands, until the proper steps have been taken by congress, or the legislature of Virginia, or the said Hebrew benevolent congregations, to receive the same and discharge

said executors.'" And the testator, in his will, further declared that "in order to enable said Hebrew congregations to hold said estate and carry on said farm school, a charter will probably have to be obtained upon the application of said congregations to the legislatures of Virginia and New York." He also gave, for the purposes of fuel and fencing for "said Monticello farm school," two hundred acres of wood land from the Washington farm in Virginia.

The cause was tried at the New York Special Term of the Supreme Court, in February, 1863, before Mr. Justice ALLEN, without a jury. The judge found the facts as stated above, and also the fact "that by the law of Virginia, the said devise of the real estate in Virginia is void." His conclusions of law were:

1. That the devise and bequest of the "rest and residue of the estate, real, personal or mixed," of the testator, to the people of the United States, or such persons as congress shall appoint to receive it, and provisionally and in succession, to the people of the State of Virginia, and certain Hebrew congregations named, upon the trusts specified in the will, are void.

2. That that portion of the estate of the testator attempted to be disposed of by the will, as "the rest and residue," and upon the trusts referred to, upon the death of the testator descended to and vested in his widow, heirs-at-law and next of kin, entitled under the statutes of descent and distribution of this State, the executors taking no estate or interest therein.

3. That the devise of the Monticello estate and farm, and two hundred acres of land in the same clause, also fails.

Judgment being entered in accordance with the decision, the same was reversed or modified at the General Term, and an appeal taken by the defendants to this court.

*A. J. Parker* and *J. H. Patten,* for the plaintiffs.

*A. W. Bradford* and *George F. Comstock,* for the defendants, Virginia Levy and others.

W*RIGHT*, J. By his will, the bulk of the testator's estate is appropriated to the foundation and endowment of a school in the State of Virginia for educating, as practical farmers, children between the ages of twelve and sixteen years, of warrant officers of the United States navy; and contingently, for educating the children between those ages of certain Hebrew congregations in the cities of New York, Philadelphia and Richmond, and children of like ages of all other Hebrew and Christian denominations. It is, in terms, provided that the institution must be kept within the revenue derived from the endowment, and under no circumstances should any part of the real or personal estate devised or bequeathed for the establishment and maintenance of the school be disposed of, but the rent and income of all such estate shall be held forever inviolate for the purpose of sustaining the institution. To effectuate the intent of the testator, his real property at Monticello, in the State of Virginia, together with the residue of his estate, real and personal, not by his will otherwise disposed of, is given in trust "to the people of the United States, or such persons as congress shall appoint to receive it." Apprehensive, however, that the primary devisee and legatee might decline to receive the title and take the necessary steps to execute the trust, in such contingency the estate is given "to the people of the State of Virginia instead of the people of the United States," provided they, by act of their legislature, accept and carry out the trust as directed; and should the people of Virginia, by neglect of their legislature, decline to accept the bequest, then and, in that event, it is given "to the Portuguese Hebrew Congregation of the city of New York, whose synagogue is in Crosby street, New York, and the old Portuguese Hebrew Congregation, whose synagogue is in Cherry street, Philadelphia, and the Portuguese Hebrew Congregation of Richmond, Virginia," provided they procure the necessary legislation to entitle them to hold the estate, and to establish an agricultural school at Monticello for the fatherless children between certain ages, of those, and any other religious societies, Hebrew or Christian. The executors named in the will were

directed to invest the funds arising from the estate thus set apart for the agricultural school in some safe paying stocks as fast as they accumulated, and hold "the whole of the property and estate devised and bequeathed for said school, and in their hands, until the proper steps have been taken by congress, or the legislature of Virginia, or the said Hebrew benevolent congregations, to receive the same and discharge the said executors." And the testator also gave, for the purposes of fuel and fencing for "said Monticello farm school," two hundred acres of wood land from his Washington farm in Virginia.

The validity of this disposition is the subject to be considered. If valid in law it is to be so declared, and effect given to the will of the testator. On the other hand, if it cannot be legally upheld, the property goes to his heirs and next of kin; the law giving the ownership to them, in case of an ineffectual devise or bequest.

It is insisted that the disposition is invalid, whether tested by common law rules, or by our statutes in respect to trusts of lands, or the alienability of real, and the absolute ownership of personal estate. It will be my object to inquire whether the ground be well or illy taken.

*First.* The residue of the testator's estate is donated, in trust, to establish and maintain perpetually, in a foreign State, a school, for agricultural instruction, of half orphan children of warrant officers of the United States navy. This disposition, it must be conceded, according to the ordinary rules of law, and the general rule in chancery as to trusts, is void. It cannot be claimed that, at common law, there can be a valid devise or bequest to an indefinite object, or a valid use without an ascertained *cestui que trust* or beneficiary. In legal limitations there must be a definite grantee, devisee or donee; and in the limitation of equitable estates the rule is the same. There must be a beneficiary or certain equitable donee, grantee or devisee. If a trust be well declared, and there be a certain beneficiary, capable of coming into court and claiming the benefit of the bequest, it is good. On the contrary, if there be no ascertained beneficiary, no definite-

ness of purpose will raise a trust. As was said by TUCKER, J., in the case of *Galigo's Ex'rs* v. *The Attorney-General* (3 Leigh, 457), "in the eye of the law, the intervention of a trustee does not remove a single difficulty. There is no more necessity for a properly defined grantee in a deed, than for a *cestui que trust* capable of taking, and so defined and pointed out that the trust will not be void for uncertainty. In short, there cannot be a trustee without a *cestui que trust;* and if it cannot be ascertained who the *cestui que trust* is, it is the same thing as if there was none." There being a sufficient declaration of the use, and a certain beneficiary ascertained, the presence or absence of a trustee in the limitation will make no difference, for equity will not allow a gift to fail for want of a trustee. The learned judge who prepared the leading opinion in *Owens* v. *The Missionary Society of the Methodist Episcopal Church* (4 Kern., 386), was certainly mistaken in conceding that, at common law, a limitation, with a trustee named, for a definite purpose, was maintainable, although there was no ascertained beneficiary. It was a mere *dictum*, which would uphold almost all conceivable trusts, unnecessary to the decision of the case, not having the concurrence of the court, and without any authority cited in support of it, but in opposition to the whole current of authority. There can be no valid trust unless there be a certain donee or beneficiary whom the law will recognize; and if there be, the use will not be defeated, though no trustee be named, or the trustee named be, in law, incapable of taking. (Powell on Devises, 418; *Webb's Case*, 1 Rol. Abr., 609; Saunders on Uses, 58, 389; Wilmott's Opinions, 22; Sheppard's Touchstone, 589; Lewin on Trusts, 105; 2 Story's Eq. Jur., § 964, 976; *Sonley* v. *Clockmaker's Company*, 1 Brown's Ch. C., 81; *Morice* v. *The Bishop of Durham*, 9 Vesey, 400; *Ononany* v. *Butcher*, 1 Turn. & Russ., 260; *James* v. *Allen*, 3 Merivale, 17; *Vesey* v. *Jameson*, 1 Sim. & St., 69; *Fowler* v. *Garlike*, 1 Russ. & Myl., 232; *Ellis* v. *Selby*, 1 Myl. & Craig, 286; *Williams* v. *Williams* (per DENIO J.), 4 Seld., 540; *Dashiel* v. *The Attorney-General*, 5 Har. & John., 400.) In

the latter case, it is accurately stated " that there is no difference whether a devise or bequest be immediate to an indefinite object, or to a trustee for the use and benefit of an indefinite object. If it be immediate to an indefinite object, it is void; and if it be a trust for an indefinite object, the property which is the subject of the trust is not disposed of, and the trust results for the benefit of those whom the law gives the property in the absence of any other disposition of it by the testator or donor." The same is affirmed of trusts in general by Sir William Grant, master of the rolls, in *Morice* v. *Bishop of Durham* (9 Vesey, 400). " If," he says, " there be a clear trust, but for uncertain objects, the property that is the subject of the trust is undisposed of, and the benefit of such trust must result to those to whom the law gives the ownership in default of disposition by the former owner. But this doctrine does not hold good (he adds) with regard to trusts for charity. Every other trust must have a definite object. There must be somebody in whose favor the court can decree performance." Tested, then, by ordinary legal rules, the disposition of the residue of the testator's estate is void for uncertainty. Passing by, for the present, the question of uncertainty as to the immediate devisees and legatees, the beneficiaries of the use are wholly uncertain. These are the children of warrant officers of the United States navy, whose fathers are dead, or contingently, the fatherless children, between the ages of twelve and sixteen years, of certain Hebrew societies named, and like children of any religious denomination, Jew or Christian. Nothing could be more indefinite in a legal sense. Reference is made to two classes of children to come into existence for all time, and who are to be ascertained only by answering the description mentioned. It requires no argument to prove that if the devise and bequest had been immediate to the classes described, they would have been void; and they are equally so where the property is given to a trustee for their use and benefit. There is a double uncertainty. It is uncertain which class of children will be the beneficiaries; and, even when the class is ascertained, the individuals are, in a

legal sense, indeterminate, because they are not named, nor can they be ascertained, now or hereafter, according to any rule of descent or succession. It is the case of a use without a beneficiary; an uncertain trust without any equitable donees known to the law. No court of equity could decree performance of the trust, for it is without a definite object. Indeed, this must always be the case with indefinite trusts maintainable as "charitable" by the English system; which this is, perhaps rightly enough, claimed to be. "Uncertainty," says Mr. Binney in his argument in the *Girard Will Case* (2 How., 127), "is indispensable to every charity. If any person has a right to claim by law, it ceases to be a charity." In *Ononany* v. *Butcher* (1 Turn. & Russ., 260), a gift of money to trustees for unascertained objects of *private* charity was held void, the master of the rolls saying, "that the charities maintained in the English courts were of a *public* nature." Of course, where the beneficiaries are the whole public, or some indiscriminate portion thereof, or class of persons, there can be no ascertained *cestui que trust* in whose favor the use can be enforced in equity. It need not be repeated, that where there are certain beneficiaries, capable of taking the equitable interest in the gift, equity will not allow a gift to fail for want of a trustee; but where the vice of uncertainty exists both in the uncertainty of the trustees, as for example, where the gift is made to an unincorporated association, and of the beneficiaries, the whole is void, and must fall. "It is fundamentally requisite," says Jarman in his treatise on wills, "to the validity of every disposition, as well of personal as of real estate, that there be a definite subject and object, and uncertainty in either of these particulars is fatal." The law has provided definite successors to the estate of a decedent in the absence of disposition, "and it would be unjust to allow the right of this ascertained object to be superseded by the claim of any one, not pointed out by the testator with equal distinctness," (1 Jarman on Wills, 316.) In a trust limitation without a beneficiary, there is no one to enforce the trust, and necessa-

rily it results to the heir, and where the trust or limitation of the equitable estate fails, the whole limitation always fails.

The disposition, therefore, attempted to be made by the testator of the residue of his estate is invalid by the ordinary rules of law, because of uncertainty as to the beneficiaries. He made this residue, together with his landed estate in Virginia, the subject of a trust for an uncertain object; a description of trust that no court of equity in England, or in this country, ever assumed to sustain and execute apart from "the law of charity" which enters into English jurisprudence.

This is not, or cannot be denied; but it is claimed that the gift is for "charity," and that an indefinite trust for a purpose "charitable," within the purview of English jurisprudence, is valid in this State, and will be upheld and enforced by our courts. Undoubtedly the purpose, in a general sense, is charitable; but whether indefinite charitable gifts, and what are charitable trusts by the law of England, are entitled to any peculiar privilege with us, is a different question. If we received, by constitutional adoption, as a part of the common law, the English system of charitable uses, and it is now the law of the State, the trust under consideration (unless directly condemned by our statutes respecting trusts of lands and perpetuities in property) might possibly be upheld, but not otherwise; although at this time, as the system prevails in England, and has for over a century past, the trust in question would be void, it being a landed foundation. (9 Geo. II, ch. 36.) That peculiar system of jurisprudence proceeds, in disregard of rules deemed elementary and fundamental in other limitations of property, in upholding indefinite charitable gifts by the exercise of chancery powers and the royal prerogative. It is not the exercise of the ordinary jurisdiction of chancery over trusts, but a jurisdiction extended and strengthened by the prerogative of the crown, and the statute of 43d Elizabeth, over public and indefinite uses, defined in that statute as "charities."

Is it now the law of the State? This is an interesting question, and to my mind the evidence seems indisputable to the contrary. We are necessarily required, for the purpose

of maintaining the existence of a system here, originating under a form of government, civil and ecclesiastic, incongruous with our own, to adopt the conclusion that it was originally deliberately introduced into the law of the State, freed from all restriction, and without legislative control or restraint, although indefinite "charitable" trusts had become so intolerable in England, and so pernicious to the general interests of the kingdom, that for nearly half a century before New York became an independent State, parliament had interfered, and cut off all uses "charitable" within the statute of Elizabeth and other British statutes, if charged in any way upon 'lands, unless created by *deed* twelve months before the death of the donor. (9 Geo. II, chap. 36.) Those who maintain that the "law of charity," as moulded and developed in England by parliament and the courts, before our political separation, is in force here, claim that it was introduced by a provision of the Constitution of 1777 (Const. of 1777, § 35), and that no development of State policy, or legislative action, has since affected its abrogation. The provision alluded to declared that "all such parts of the common law and the statute law of England, and of the acts of the legislature of the colony of New York, as together formed the law of the colony on the 19th April, 1775, should be and continue the law of the State, subject to such alterations and provisions as the legislature of the State should, from time to time, make concerning the same." Thus the system is claimed to have been originally fastened on us. We received it, it is said, as a part of the common law, and the evidence that it ever was a part thereof, consists in the fact of comparatively modern development that, before the statutes of 39th and 43d Elizabeth, the priestly chancellors of those remote ages sometimes assumed a jurisdiction to enforce pious, benevolent, superstitious and other indefinite trusts, as the Record Commission shows they did sometimes, in cases of assault and battery, abduction and breach of the peace. It is obvious that but little light can be thrown upon the question whether "the law of charities" was engrafted on the common law antecedent to the statute of Elizabeth, by a

reference to this unreported jurisprudence of the middle ages. The law, in all its elements, was then in its infancy. There were then, in a legal sense, no charitable uses. The doctrine of indefinite uses was certainly a disputed doctrine. In a case in the Year Books (15 Henry VII, 12, *a*), it is distinctly laid down that a will creating a trust for pious uses could not be enforced, because "*no one hath damage*" by breach of the trust; thus urging precisely the true objection to an indefinite use. Since the Elizabethan age the utterance of the common law has been uniform and distinct. The statute codified, enumerated, and sustained certain uses, and left all other indefinite trusts to be dealt with according to the common law. If, before that time, the common law of trusts, under the clerical chancellors, leaned in favor of a use without a beneficiary, the error was corrected when the statute was passed, and since then has never been repeated in a single reported case in England. New York was a Dutch colony until its conquest by the English in 1664, and prior to that time the rule of the common law in England was settled, as it now exists, in opposition to all indefinite uses. A "charitable trust" is simply an indefinite or uncertain trust — a trust without a beneficiary; and certainly a trust of that description is void by the rules of the common law as it existed at the time of adoption by us, and now exists. If there is a single postulate of the common law established by an unbroken line of decision, it is that a trust without a certain beneficiary who can claim its enforcement, is void, whether good or bad, wise or unwise. This is conceded. When it is affirmed, as in *Williams* v. *Williams* (4 Seld., 525), that a bequest by the general rules of law (that is, the common law) is defective and void as a conveyance in trust for want of a beneficiary in whom the equitable title can vest, I am at a loss to discern how the conclusion can be reached that the trust is valid by the same common law. It manifestly can only be reached by assuming a distinction between a "charitable" and any other indefinite trust; a distinction, in my judgment, impossible in the absence of a legislative code defining what are charities. If,

then, when we received the common law into our jurisprudence, the English doctrine of charitable or public uses did not come with it, but exactly the opposite rules in respect to indefinite trusts, all discussion is at an end. The doctrine came to us with the unwritten law of England, or not at all, and it is incumbent upon those who maintain the validity of trusts, like the one in question, as *charitable* uses, to show that the law of charity was a part of the common law when we received it ; in other language, that by the principles of the unwritten law, as it then existed, certain indefinite trusts were valid whilst others were void. But let this pass for the present, and let it be conceded that prior to the statute of 43d Elizabeth the English Court of Chancery assumed to exercise, unaided by the royal prerogative, a kind of loose, imperfect jurisdiction in cases of gifts at large, denominated pious or charitable ; and in this way the law of charities, as understood in England, was, at that remote period, engrafted on the common law. It is not asserted that we receive the system unimpaired, but only such parts as are applicable to our political condition. There is no royal prerogative to extend and strengthen equity jurisdiction ; but such jurisdiction as the English Court of Chancery exercised over the subject, without its aid, it is contended, was devolved upon our courts by the constitutional provision ; and that all legislative action, in the earlier or later periods of the State government, to alter the law, or change the law and policy of the State in respect to indefinite uses for charity or religion, has proved futile and unavailing. If this be so, State legislation, throughout our whole existence, in respect to uses, trusts, and perpetuities affecting the public interests and welfare, is unaccountable.

An attentive study of the legislative history of the State, will lead to the conclusion, that if the legislative power has not succeeded in extirpating the law of charitable uses as it prevailed in England in 1775, and establishing a State policy and system of her own in respect to indefinite uses, either for charity or religion, or any other purpose, the intention has plainly existed to do so. It is difficult, not to say impossible,

to satisfactorily account for State legislation, beginning soon after the formation of the government, and continued down to the present time, upon any other theory. It may be conceded that the Record Commission of 1827 shows that prior to the statute of 43d Elizabeth, the English chancery, by bill and information in the name of the attorney-general, and it may be by intervention of an *amicus curiæ*, exercised a loose and imperfect jurisdiction in enforcing trusts for certain " charitable purposes." Be it so, and let it be conceded that prior to the statute, what were afterwards denominated in the law of the British realm " charities " and " charitable uses " were sometimes enforced in chancery, independently of the royal prerogative, still it remains true, as matter of fact, that when the first State Constitution was adopted, and in the infancy of the State government, it was the universal opinion in England and this country, among lawyers and jurists, that all charitable trusts depended for their validity, and had their origin in the statute of Elizabeth. (*Collinson's Case*, Hob., 136; 2 Black. Com., 374; *Attorney-General* v. *Bowyer*, 3 Vesey, 714; *Baptist Association* v. *Hart's Ex'rs*, 4 Wheaton, 1, and cases cited; *Yates* v. *Yates*, 9 Barb., 324; *Owens* v. *The Missionary Society*, 4 Kern., 380; *Dashiel* v. *The Attorney-General*, 6 Har. and John., 292; Story's Eq. Jur., § 1142, 1143, 1144.) Although the Record Commission may be said to have thrown a doubt over the question, it is easy to see how this understanding arose. Take *Collinson's Case*, decided 17 years after the statute of Elizabeth was enacted. It was an indefinite trust, viz., to repair highways. The report, says: " We resolved clearly that it was within the relief of the statute of 43d Elizabeth, for though the devise was utterly void, yet it was within the words [of the statute] " limited and appointed to charitable uses ;" and in that case it was held that the proceeding to maintain a charitable use, under the statute, might be by bill in equity, although the statute itself speaks only of a commission. And so it has been held ever since. The case of the *Baptist Association* v. *Hart's Ex'rs* (4 Wheaton, 1), was among the first, if not the first one of charitable use

ever decided in this country; and in that it was expressly determined that charitable uses had their origin only in the statute of Elizabeth. In this Judge STORY concurred with Chief Justice MARSHALL, though the former, after the Record Commission, inclined to a different opinion. It is to be supposed that the legislature, in 1788, had the same understanding of the law on this subject as the judges and lawyers of that time. In 1788 the legislature, by a general enactment, repealed the statute of Elizabeth, the statute against superstitious uses, and the mortmain acts, including that of 9 Geo. II (2 Greenleaf's Laws, 136, § 37), thus sweeping away all the great and distinctive land-marks of the British system. Why this repeal of a statute defining what in English law and jurisprudence were charities, unless the legislature intended by the act, and supposed that would be the effect of the repeal, to abrogate the entire system of indefinite trusts which were understood to be supported by that statute alone. It will hardly do to say that the form was gone through of repealing the statute, because it had become practically obsolete in England as a mode of proceeding, and was unfitted to our political and social condition. As a mode of proceeding it may not then have been often resorted to, but as a legislative definition of charities, within the authority of chancery, and capable of being established and regulated thereby, it was then, and always had been appealed to. And then, the repeal of the statute of mortmain still more significantly evidenced an intention to abrogate the system. The mortmain act of 9th Geo. II, was enacted to restrain the sweeping influence of the statute of Elizabeth. This, latter statute had been, for many ages, construed with the most surprising liberality, and under it charities, so called before the statute so termed them, grew up until the system in some of its aspects had come to be considered an enormous public evil. It is not to be assumed that the sagacious men, who shaped the legislation of the State in the early periods of the government, would designedly leave in force a system of indefinite trusts, without any restraint whatever, when the experience of the mother country had

shown that a system of public or charitable uses, without legislative definition and restraint, was not to be tolerated. It cannot be reasonably inferred, from a repeal of the great mortmain act, so called, an intention, in a State without an established religion, to give full scope to the founding and endowing of all sorts of religious establishments, and putting in mortmain, for their benefit, the property of the State. From the beginning, the founders of the government clearly indicated a different policy from that which prevailed in England, in respect to trusts for charitable and religious purposes. That policy was not to introduce any system of public charities, except through the medium of corporate bodies. Accordingly, before and cotemporaneously with the repeal of the statute of Elizabeth and the mortmain acts, in addition to the general law enacted in 1784, for the incorporation of religious societies, special acts for incorporating such societies were passed. There were likewise other acts passed, creating or authorizing corporations for various religious and charitable purposes; in all of which are to be found limitations upon the amount of revenue to be held by such societies, and the purposes to which it was to be applied, and requirements for furnishing inventories, and reporting any excess of property to the legislature. This legislation indicates that the policy, from the foundation of the government, was to confine within certain and narrow limits the accumulation of property perpetually appropriated, even to charitable and religious objects. The absolute repeal of the mortmain act, and of the statute of Elizabeth, was wholly inconsistent with the policy thus indicated, except only upon the ground of the understanding and conviction of the early legislators of the State, that charitable uses, if they had ever existed in the colony or State, were not founded upon or sustained, except by force of the latter statute; for the effect of that appeal, with other British statutes, was to remove (it being true that indefinite charities were maintainable in chancery without its aid) every restraint upon individual action, and put it in the power of any man to appropriate his whole property in perpetuity to the purposes of charity

or religion, making the Court of Chancery his trustee. How idle was it for the legislature to limit so carefully the powers they bestowed upon religious and charitable corporations. How useless for benevolent individuals to seek acts of incorporation, or to trust private trustees, when the Court of Chancery, upon the mere will of the founder of the charitable gift, would insure its perpetuity and superintend its administration. To my mind, the evidence is irresistible that the legislature of 1788 intended to abrogate (and that that was the effect of their action) the whole law of charitable uses, as understood and enforced in England. If the law of charity, as it existed at the time of the revolution, was based upon the statute of Elizabeth, then the repeal of that statute directly worked its abrogation. If the system of indefinite charities could be enforced in equity, prior to the statute, it was, nevertheless, the intention by such repeal to abrogate the system; and the effect of the repeal, and the cotemporaneous initiation of a different policy, and one better suited to our social and political condition, was to effectually displace it.

It is unnecessary, however, to rely exclusively upon the early legislative action referred to in determining whether the State has not, by her laws and policy, rejected the British system, and substituted and established a different one, resting upon legal principles and enactments. Throughout our whole existence, learning, piety and benevolence — every truly charitable object — has been amply encouraged, the result being attained through the medium of corporate bodies created by the legislative power; their charters specifying the precise nature of the charity intended to be sanctioned and encouraged, and in all cases limiting the amount of property to be enjoyed, and otherwise, such as the public welfare was supposed to require. This policy, as has been suggested, was inaugurated cotemporaneously with the repeal of the British statutes, and, it may be now added, has been followed up to the present time. An allusion to the course of legislation will show it. In 1784, a general law was passed for the incorporation of religious societies, with

limitations upon the amount of estate 'they could acquire and enjoy, and requiring the trustees to render stated accounts to the chancellor. (1 Greenl. Laws, 71.) The statute was substantially reënacted in 1813, and is now in force. In April, 1796, a general act was passed for the incorporation of public libraries, with capacity to take and hold real and personal estate, but limiting the amount; and in 1853 the policy of this act was revived upon a broader basis. (Laws of 1852, ch. 395.) As early as 1790, the legislature began incorporating, by special charters, societies for a great variety of religious, literary, scientific, benevolent and charitable objects, and this policy has been continued and enlarged ·by chartering, from time to time, hundreds of such societies, but in all cases with limitations and restrictions upon the amount of property to be enjoyed. (See Index to Laws of New York, by Gillett, 1859, pp. 171–178, 373–397.) At more recent periods general laws were enacted affording a still broader field for charities, and at the same time keeping the subject under legislative control and supervision. In 1840, an act was passed authorizing gifts of real and personal estate to any *incorporated* college or other literary incorporated institution in trust, to found observatories, professorships and scholarships, and for any other specific purposes comprehended in the general objects authorized by their respective charters; also, providing for gifts to the corporation of any city or village in the State, to be held in trust for any purpose of education, or the diffusion of knowledge, or for the relief of distress, or for parks, gardens and other means of recreation and health; and, also, providing for like gifts to commissioners of common schools and trustees of school districts for educational objects. (Laws of 1840, ch. 318.) In 1846, this act was amended so as to allow income to be accumulated, in certain cases, to a specified extent. (Laws of 1846, ch. 74.) In 1848 a general act was passed, entitled "An act for the incorporation of benevolent, charitable, scientific and missionary societies. By this act corporations might be formed by filing a certificate for any of the purposes comprehended in the title; but a majority of the signers must be citizens, and the certifi-

cate must be approved, in writing, by a justice of the Supreme Court. Corporations thus formed might take, by purchase, devise or bequest, gifts of real estate to the value of $50,000, and of personal, to the value of $75,000. It was provided that no person leaving a wife, child or parent, could, by will, give more than one-fourth of his estate to these institutions, and no gift by will should be valid unless the will be executed at least two months before the death of the testator. Such corporations were made subject to visitation by the justices of the Supreme Court, or persons appointed by that court, and the trustees were required to make annually a public statement of their affairs. (Laws of 1848, ch. 319.) In 1849, the statute was amended so as to provide that all existing benevolent, charitable, scientific and missionary societies might reincorporate themselves under the act (Laws of 1849, ch. 273), and in 1862, the benefits of the act were extended so as to authorize the incorporation of historical and literary societies. (Laws 1862, ch. 273.) In 1860 another statute was passed restricting bequests to corporations and associations, in certain cases, to one-half of the testator's estate after payment of his debts. (Laws of 1860, ch. 360.)

Thus, it is seen, that a policy and system, in its essential characteristics, differing from the British system, and absolutely inconsistent with the supposition that uses for public or indefinite objects could be created and sustained without legislative sanction or restraint, began with the formation of the State government, and has been persistently continued throughout all its existence. The British statutes which supported, regulated and restrained indefinite uses, deemed religious and charitable, were abrogated, and at a time when the opinion was universal that they depended wholly upon those statutes. The intention was to abolish the system, and not, as has been suggested elsewhere, to free it from all restriction and control. We cannot suppose for a moment, that by the repeal it was intended (and that would have been the consequence unless the system itself fell to the ground) that indefinite trusts of every kind and description, however irrational or absurd, supertitious, fanatical or idolatrous, should

become valid in equity; and that the property of the donors, without limit or restraint, might, at their own will, and for the promotion of such objects, be withdrawn and put in mortmain, away from the general uses of society. It was important, at that early time, that the property of the State should not be largely withdrawn from general and devoted to special uses, even though the latter was the founding and endowment of institutions of useful learning and true piety, or setting on foot truly benevolent schemes for ameliorating social evils; but it was of the last importance then, and ever will be to the public interests and welfare, that such property should not be withdrawn from circulation, and the general uses of society, for promoting objects, public in their nature, unsanctioned by the legislative power, and which may be in themselves the offspring of the grossest ignorance, caprice and folly. In all civilized societies, the dissemination of learning and the encouragement of religion and charity, are objects to justly engage the attention of the law making power; but it is a necessity of the subject that trusts or uses of property for the promotion of those objects, which affect the public interests and well being, should be created under legislative sanction and control. Who shall say what is useful learning, what is benevolence, and what is charity, unless it be the legislature? The judiciary can apply no tests. Who, also, shall determine the amount of property that may, consistently with the public interests and welfare, be withdrawn from circulation and the general uses of society, and put in mortmain for the special use, but the legislature? It is obvious that with us no object can be charitable, in a legal sense, that has not the legislative sanction. We have no general statute defining what is charity in law. The gift, in the present case, is said to be to a *charitable* use, and so it is in a general sense, and within the statute of Elizabeth. But we have no statute declaring what is legal charity. Here, necessarily, in respect to trusts or uses, public in their nature, where the legislature has not defined or sanctioned the particular object to be promoted, it can only be dealt with by the courts as a question of uses

without a beneficiary—uncertain trusts without any equit-able donees known to the law.

Our legislative department, in every stage of the government, has recognized the obligation to encourage learning and piety, and all objects truly benevolent and charitable. To repudiate a system of public charities, originating in and enforced under another form of government, civil and ecclesiastic, and adapted to the state and condition of society therein, was not surprising. It was palpably incongruous with our political system and the principles that lie at the basis of our government and institutions; not adapted to our social condition, and impracticable of execution. But "the great law of charity" was to be saved, whilst it was preserved from alliance with gross and degrading forms of error and folly. The policy and system adopted for effecting this end has steadily looked to keeping the subject, at all times, under legislative control and restraint. No general statute was ever passed defining what were charities in law, for this, in our age of progressive civilization, would have been impracticable. It was also inconsistent with sound policy that the wealth of the State should be unrestrictedly withdrawn from general and devoted to special uses. Our policy has been, and is, to encourage learning, piety and benevolence by the enactment, from time to time, of general and special laws, specifying and sanctioning the particular object to be promoted, restricting the amount of property to be enjoyed, carefully keeping the subject under legislative control, and always providing a competent and ascertained donee to take and use the charitable gifts. These laws (and they are spread over the whole legislative history of the State) by creating corporations, have supplied, in every instance, a definite and ascertained donee capable of taking the whole legal and equitable interest in the gift; and at the same time specified, in all cases, the precise nature of the charity intended to be sanctioned and encouraged, and the amount of capital that could be withdrawn from the general uses of society for its promotion. The system thus established is symmetrical and consistent; and in harmony with the whole body of our writ-

ten law. We have no mortmain acts, so called, and none were needed, or would be in harmony with it. But the restraints of mortmain are not abandoned, but exist within the very laws of charity, and form a part of every legalized charity in the State. The exception in the statute of wills denying to corporations in general the capacity to take lands by devise, and the restrictions contained in all charters, exhibit the entire mortmain policy of the State. As we retained the principle of incorporated charities, resting on legislative power, so we retained the wise and wholesome restraint against endowing them by will. The special and peculiar restraint upon the acquisition of lands by will, founded on the policy of protecting "dying and languishing persons" and their families is perpetuated in the exception to the statute giving power and capacity to make a will. There was a propriety in a mortmain policy applicable to charitable corporations only; for in each case, if the object met the legislative approval, authority was given to take and hold the gifts under such regulations and restraints as the legislature deemed consistent with the public welfare. Our statute abolishing all uses and trusts, except those, in terms, specified, does not conflict, but is in complete harmony with the rules applicable to devises, gifts and conveyances to charitable corporations, because limitations of that character do not create a trust at all, and if they did, they have the express sanction of the legislative power. Nor do our statutes against perpetuities interfere. Our rule and statute against perpetuities only requires that the whole interest shall be vested and not contingent. A vested gift to a charitable corporation is not within the rule.

Thus the system is harmonious and symmetrical; but if it is to be regarded as not intended to express the entire will of the State on the subject of charities, and we are to assume the existence and validity of charitable uses outside of the legislative sanction through corporate charters, State legislation and policy, from the origin of the government, are strikingly inconsistent and absurd. We have repealed all statutes that support, maintain and restrict indefinite uses. We have

enacted none defining what, in a legal sense, are charities. We have a clear and well defined mortmain policy restraining and limiting gifts to corporate charities, which are approved in their principle and design by the legislature, while indefinite and perpetual uses, created without any sanction in respect to their object or otherwise, are freed from all restraint. We have adopted a mortmain policy applicable to corporations only; one essentially useless and nugatory, if gifts to unincorporated bodies, without any restraint whatever, were to be tolerated. We have restricted gifts by will, to charitable corporations, in certain cases, to one-fourth of the testator's estate, and declared invalid any gift to them by will, unless the will be executed at least two months before the testator's death; but there is no positive law restricting devises or bequests to charitable or indefinite uses, or protecting against improvident wills, where a corporation is not the donee. Under the general act of 1848, for the incorporation of literary, religious, charitable and benevolent societies, any three persons can unite, sign their articles of association, have them approved and filed, and they become a corporation which can take a donation by will (provided the will be made two months before the testator's death) of *not more than one-fourth* of his estate, if he have a wife, child or parent; but according to the doctrine of indefinite trusts contended for, if the same three persons, wishing to evade the restrictions, omit to file their certificate, and do not become a corporation, they can take without limit or restraint as *unincorporated trustees;* they can hold millions in perpetuity forever, and any person in the very last moments of life, can disinherit his heirs, and give the whole of his estate to a public use, which may be good or bad, beneficent or monstrous. In my view, the legislature is not to be charged with these absurdities, but, on the contrary, has throughout pursued a consistent policy, establishing a system by and through which, on the one hand, every impulse of enlightened and christian benevolence may find opportunity and scope according to legal principles and forms; while on the other, testamentary uses of this nature, unsanctioned by the legislative power,

and which may be in themselves irrational or absurd, super-
stitious or idolatrous, become impossible in judgment of law;
a system which excludes indefinite and unauthorized trusts,
gives the most ample encouragement to objects truly chari-
table, deemed consistent with the public welfare.

In my judgment, then, that peculiar system of English
jurisprudence for supporting, regulating and enforcing pub-
lic or charitable uses, void by the rules of law, is not the law
of the State. If it ever was the law here, it has been abro-
gated or displaced by a system and policy of our own in
respect to such uses. A system which allows the purpose of
the charitable donation to be declared by the donor, and
who, at his own will, may appropriate his property to any
extent to promote such purpose, making the Court of Chan
cery his trustee and superintendent in administering the gift,
has now no existence among us. I am aware that the ques-
tion has been heretofore incidentally examined in this court,
with great power and ability, and an opposite conclusion
reached by a majority of its members. I should be as re-
luctant as any one to reëxamine a question and disturb a
decision deliberately made here ; but when a decision is so
far-reaching in its consequences, and the court itself has not
since adhered to the principle decided, it is not unbecoming
or improper to reëxamine the subject at large. Indeed we
should do so, if there is a probability that we erred, and
when a particular class of trusts are to be sustained, if at all,
by violating the rules of the common law, and the express
statutes of the State. That there has not been an adherence
by the court to the original decision, and the case of *Wil-
liams* v. *Williams* (4 Seld., 525), followed, is easily shown.
In *Williams* v. *Williams*, it was held that the English law
of charitable uses was the law of the State; and, conse-
quently, a bequest to three persons (naming them), and to
their successors, to be appointed by themselves, in trust, "for
the education of the children of the poor, who shall be edu-
cated in the academy in the village of Huntington," was
upheld. Neither the trustees or beneficiaries were legally
ascertainable, nor had the trustees legal capacity to take and

administer the gifts; but that made no difference if the English doctrine of charitable uses was to be applied to the bequest. Three years afterwards, in *Owens* v. *The Missionary Society of the M. E. Church* (4 Kern., 380), the question again arose. The bequest there was of all the residue of the testator's estate "to the Methodist General Missionary Society, appointed to preach the gospel to the poor. L. C." This was treated as a bequest in trust for charitable purposes; one in general void, as well in equity as in law, and only to be sustained by the doctrine of the English courts of equity in regard to charitable trusts. Judge SELDEN again examined the question of the introduction of the law of charity, as understood and enforced in England, into the law of the State, and reached directly the opposite conclusion to that enunciated in *Williams* v. *Williams*, holding that the law was not in force here, and as a consequence, the bequest could not be sustained. In this opinion a majority of the court concurred. Of course, there could be no pretense, that where there was uncertainty both in the trustee or administrator of the fund, and in the beneficiaries, there was a valid trust, or one ever sustained without the aid of the peculiar jurisdiction exercised by the English courts of equity over "charities." The judge, in his opinion, undertook to distinguish the case from *Williams* v. *Williams*, on the ground, that in the latter there were competent trustees to take the fund in the first instance, whereas in the former there were none. This was, as matter of fact, a misapprehension. There was not, in either case, any ascertained or competent trustee. In one, the bequest was in trust to a voluntary association of persons; in the other, to three persons named by the donor, and both equally unknown to the law. It was this misapprehended distinction, together with an erroneous *dictum* to be noticed, that probably induced the remark in *Beekman* v. *Bonsor* (23 N. Y., 298), that the diversity of views of the judges delivering opinions in the two cases on the question of the introduction of the law of charitable uses into the law of the State, led to no practical difference in conclusion or result. So, also, the judge

appeared to think, that independent of the peculiar system of jurisprudence in regard to indefinite charitable gifts, if, in a devise or bequest, a trustee was named for a definite purpose, a legal and valid trust would be created, although there was no ascertained beneficiary. This was a mere *dictum*, not countenanced by his associates, and running counter to all authority prior to the case, although approved since by a former judge of this court. The proposition is false in both its branches. A trustee is not necessary to the validity of a trust, for a use being well declared, the law will find a trustee wherever it finds the legal estate; and the definiteness of the *purpose* of the trust does not make a good use if there is no definite object or beneficiary. The value of the decision consists in a deliberate protest, at the earliest time, against the conclusion so ably enunciated in *Williams* v. *Williams*, that the law of charitable uses, existing in England at the period of the American revolution, is now the law of the State. In *Marshall* v. *Downing* (23 N. Y., 366), a gift to the American Home Missionary Society, an unincorporated association, was held void. It was admitted that the society was a charitable organization, and the gift for charitable or pious purposes. It is true, that there was no competent trustee, or any ascertained beneficiary to take the gift, and in whom the equitable interest could vest, and hence, a valid common law trust was not created; but if the "law of charity" prevailed here, there would have been no difficulty in upholding and effectuating the bequest. Indeed, in Vermont, a gift to the same religious association was sustained as a charitable use. (*Burr's Ex'rs* v. *Smith*, 7 Vermont, 247.) It was immaterial under the peculiar system, whether the donor had designated the trustee or administrator of the fund or not; or whether such trustee, if pointed out, was legally competent to take. Chancery would be the donor's trustee, and execute his will. So that, in at least two cases in this court, since that of *Williams* v. *Williams*, has the principle that decided one of the bequests in the latter case to be valid, been disaffirmed.

It being true, then, that trusts for "charity" have no

peculiar privilege in the courts of this State over other trusts of property, it follows that the one attempted to be created by the testator, in the present case, is invalid for want of a *cestui que trust* in whom the equitable title to the estate, devised and bequeathed, could vest. There is no ascertained beneficiary in whose favor performance may be enforced. The gift is for the use and benefit of an indefinite object.

But if this objection were obviated, there is still another that seems equally fatal to the disposition. The immediate devisees are uncertain, and without capacity to take as trustees for the management of the particular trust. If the *dictum* in *Owens* v. *The Missionary Society*, reiterated in *Beekman* v. *Bonsor*, and *Marshall* v. *Downing*, that a charitable donation, void at law, because the beneficiaries are unascertained, may be maintained, if there be a competent trustee to take the fund and effectuate the charity, is to be regarded as the law, then, I think, this trust must fail. The devise is, primarily, "to the people of the United States," to establish and maintain, perpetually, a school for the education of persons undefined, except as a class; and, secondarily, "to the people of the State of Virginia," for the same purpose. Now, conceding that the testator intended as the trustee of the charity, the United States, as a political body, has it, as such, capacity to take and act? We are not advanced a single step towards a solution of the point by a concession that the United States government may take directly by gift, grant, or devise, property for governmental use or benefit. If it takes, under the devise and bequest of the testator, it must be upon the trust and for the special charity, viz., to found and perpetually conduct a school for agricultural instruction of a certain class of children in the State of Virginia. Is it, therefore, within the scope of its political corporate capacity to administer indefinite charitable trusts? It seems to me there can be but one answer. The United States exists under grants of power, express or implied, in a written constitution, and the functions of all the departments are definitely limited and arranged. It is not within the express or implied powers of the government, as organized, to administer a charity. The

action in the case of *Smithson's* bequest to found an institution of learning at Washington, furnishes no evidence of its capacity, simply as a political organization, to take and hold property in trust for charitable purposes. That was an English charity. The case was determined by the law of the domicil. It was a charity under the statute of Elizabeth, and administered as such; and took effect only on a law of congress organizing the institution. So, also, with regard to the State of Virginia, however comprehensive the State sovereignty, its officers are regulated in their duties by a written constitution, which does not contemplate special trust functions. Simply as a political corporation, neither government has capacity to take or act. If, then, the devises and bequests were intended to be made to the United States, and to the State of Virginia, as political bodies, I think they are void, because neither the United States or the State is capable of taking as trustee for the management of the special charity. Nor were the religious societies, named in the will, competent to take and hold the property, for the purposes of the trust created, in the event of the failure of the original intention of the testator. These religious organizations were severally located in New York, Pennsylvania, and Virginia, and it is not shown that either of them was or is incorporated, except the one in this State. The purpose was the establishment of a school in Virginia for educating, as agriculturists, fatherless children of the particular Hebrew societies, and like children of any other Hebrew or Christian denomination. This was a purpose in no way appertaining to the objects for which the societies were instituted; and, upon the supposition that they were all religious corporations, they had no power to act as trustees of a fund designed for other purposes, or as managers of an institution to be founded, under their direction, for carrying out objects foreign to those contemplated by their incorporation. The society, or congregation, in New York, was incorporated under the general act of 1813, authorizing the creation of religious corporations (Laws of 1813, ch. 60), and under that act it could only take property *for its own use.* The statute of wills expressly provides that

no devise to a corporation shall be valid, unless such corporation be expressly authorized by its charter, or by statute, to take by devise. (2 R. S., 57, § 3.) This corporation, having only authority given to it by statute to take by devise for its own use, could not take for any other use. But it seems clear to me that neither the statute of 1813, or the general statute, which defines and regulates the powers of all corporations, and enumerates those that they possess (1 R. S., 600), recognize the action of religious corporations, as trustees, for purposes outside of those contemplated by their incorporation; and so the testator appears to have supposed in making the devise expressly contingent upon all three of the societies procuring some new legislation on the subject. The domestic corporation, therefore, was incapable of taking. It might as well be affirmed that any of our banking or insurance corporations could take and hold property in trust, and manage a charity like that contemplated by the testator's will. The religious congregations out of the State clearly have no capacity to take and act as trustees. There is no evidence that they were other than voluntary religious associations; but, if they were incorporated, they cannot have, by comity, a greater or better title to take than our own domestic corporations. If it be the law, therefore, that a charitable gift will be maintained in the courts of this State, if a competent trustee be designated by the donor to take the fund and effectuate the charity, there is none answering the description in this case.

*Second.* The disposition in question is in contravention of our law of perpetuities. This is so even though the use may be maintainable as a charity; for "charitable" donations form no exception to the statute against perpetuities, at least if contingent and executory. The devise is to the people of the United States, or such persons as congress shall appoint to receive it, in trust, to establish and maintain a school for instructing half orphan children of warrant officers of the United States navy: and in the event of congress refusing to accept the property, or take the necessary steps to carry out the testator's scheme, then to the people of the State of

Virginia, provided they, by acts of their legislature, accept the same, and carry out such scheme; but if congress and the State legislature should both decline to accept the trust, then the gift is to certain Hebrew congregations named, upon new and different trusts, provided they procure the necessary legislation to entitle them to hold the estate and execute such trusts; and the executors were "to hold the whole of the property and estate devised and bequeathed for the special uses, until the proper steps had been taken by congress, or the legislature of Virginia, or the Hebrew congregations, to receive the same, and discharge the said executors." This is plainly no present devise. The testator did not intend an immediate devise of the legal or trust estate, to any of the three classes of alternative trustees. He did not mean that the property should pass unless the object to which it was to be devoted should be secured by some legislation of congress, or of the State of Virginia, or other States, which would bring the establishment and management of the school under the guarantees and sanctions of law. The property was to be held *in trust*, provided the trust was accepted and secured by proper legislation, and only in that contingency. It was a condition precedent to the devolution of the estate (which by the express terms of the will was in the executors), that the congress of the United States, or the legislature of Virginia should, by their action, signify an acceptance of the trust attempted to be created, and provide for its execution; or that the Hebrew congregations (in case of the United States or the State of Virginia declining to accept and execute the particular trust devolved on them) should obtain the necessary legislation to enable those congregations to hold the property and perform the trusts alternately confided to them. The period during which these things are to be done, is not legally defined or limited. The power of suspending the alienation of estates in land, and the absolute ownership of personalty is expressly limited by statute *upon life*. Life must, in some form, enter into the limitation; and any other term of limitation, however short, is unlawful. Here, certain acts are to be done by congress or the legislature of Virginia, or other

States, and the performance of these acts is a precedent condition to the devolution of the estate. Their performance is not limited on life. This is a limitation in contravention of the statute. The legislative power might never be exercised. If exercised at any period after the death of the testator, say within a year, and in that case would be valid, it would be valid if exercised at the termination of one hundred years. The suspension of the estate would, therefore, in each case, depend not on the statutory limitation, a life or two lives in being, but upon the volition of some legislative body, to be exercised at some indefinite time, or perhaps, never to be exercised. The estate might thus be suspended forever. (*Rose* v. *Rose*, Court of Appeals, Sept., 1864; *Phelps* v. *Pond*, 23 N. Y., 69; *Leonard* v. *Burr*, 18 N. Y., 96; *Yates* v. *Yates*, 9 Barb., 324; *Morgan* v. *Masterton*, 4 Sandf. S. C., 442; *Hawley* v. *James*, 16 Wend., 61, 131.) Again, the gift is to the United States upon a certain trust, provided congress accept the same: *secondly*, if congress refuse to accept or take the necessary steps to carry out the testator's intention, then to the State of Virginia upon the same trust, provided that State, by acts of the legislature, accept it and carry out the testator's scheme; and *thirdly*, if Virginia declines to accept, then to the Hebrew societies, named upon a new and independent trust. It is impossible to say that the gift was intended to vest at the death of the testator. By the terms of the will, the equitable estate, at least, is in suspense, until it passes by congress, and the State of Virginia, and the Jewish societies are reached. Unless congress accepted the trust, and took the necessary steps to effectuate the charity, the equitable interest in the gift was not to vest, nor was it to vest if Virginia refused to accept and carry out the trust, for in that event, the gift is to the Hebrew societies. It was made then to depend upon the action of congress or the legislature of Virginia, whether the gift should take effect. This is a limitation upon events of indefinite occurrence, and is in contravention of the rule against perpetuities. "The rule," says Lewis, "requiring all future limitations to be such, as if they take

effect at all, will necessarily operate within the period of. lives in being, and twenty-one years (in our State two lives in being) obviously condemns, as invalid, every gift of a future interest in property, made to depend on an event which, although it may possibly happen within the allowed period, may possibly also not happen until after the expiration of such period. * *  Let the event contemplated be what it may, and the probability of its early occurrence as great as it may, it will, in every case, be of too remote expectancy, and a limitation upon it will, therefore, always be void, unless either from the nature or internal quality of the contingency, or from express provision and restriction, it be certain that the event which is to give effect to the limitation will happen, if at all, within the period of lives in being, and twenty-one years." (Lewis on Perpetuities, 478, 481.)  Again, by the terms of the will, if in the contingencies named, the legal or trust estate goes over to the three religious societies, the equitable interest shifts also from the children of navy warrant officers to another. class of beneficiaries — the children of the religious societies.  Here is an indefinite suspension of the equitable estate, arising from the contingent character of the devise.  At the death of the testator, it was uncertain in which direction the estate was to go; and that uncertainty still remains.  It is still uncertain which class of children may become the beneficiaries — to which purpose the estate will be devoted — and it may remain so indefinitely, unless, indeed, the default of the United States or Virginia, for an unreasonable time, shall determine the question in favor of the children of the societies.  But again, the trust intended is, by its own express terms, a trust *in perpetuity*. The testator says in the most explicit manner that, " under no circumstances can any part of the real or personal estate hereby devised be disposed of (meaning that the *corpus* or principal of the estate shall never be alienated), but the rent and income of all said estate, real and personal, is to be held forever inviolate for the purpose of sustaining this institution " — the school.  There is no power of alienation of the estate, either during a life or lives in being, or in any

other period during all time; but the trustees, whoever they might be, must of necessity, by the terms of the devise, hold all the property in perpetuity, and can never in any manner alienate the same. It is conceded that a trust of such a character is directly condemned by our statute against perpetuities; and the only answer attempted to be offered is, that the statute does not apply to a trust for a charitable purpose, conceding the trust in question to be of that description, and valid in all other respects. The English rule of perpetuity has been held to apply to executory limitations to charity, and I am not aware of any case, in our own courts, holding that where the limitation for a charitable purpose is contingent and executory, it forms any exception to our statute against perpetuities. Sir EDWARD SUGDEN, in the Irish chancery, held a trust for charity void on the precise ground that the use was contingent for a period not allowed by the law of perpetuity. (*Com. of Charity Donations* v. *De Clifford*, Dru. & War., 245.) In *Rose* v. *Rose*, decided in this court in 1864, this court declared the same doctrine. In that case the bequest was of personal estate to a benevolent society, upon the contingency of raising $300,000 from other sources within five years. If that sum was not so raised, the estate was given to other charitable beneficiaries. The utmost limit of the suspension was five years; but it was not circumscribed by lives, as the statute of perpetuity requires, and it was adjudged to be void. The same point was also unanimously determined in *Phelps* v. *Pond* (23 N. Y., 69). The principle was also asserted in *Leonard* v. *Burr* (18 N. Y., 96), and by the Superior Court of New York in *Morgan* v. *Masterton* (4 Sandf. S. C., 442). We might stop here and repose this case, I think, upon the decisions in *Rose* v. *Rose* and *Phelps* v. *Pond* (*supra*), but I am not content to do this, as it might be claimed that the suspension in those cases arose from a contingent limitation, and that there is a distinction between such a case and a case where the suspension flows from an indefinite perpetual use. It is to be observed, that our rule against perpetuities is statutory; whereas in England, and in this State, prior to the revision of 1830, it was judi-

·cial. The statute declares that every future estate in lands shall be void in its creation, which shall suspend the absolute power of alienation, by any limitation or condition whatever, for a longer period than during the continuance of not more than two lives in being at its creation (1 R. S., 723, §§ 14, 15), and that the absolute ownership of personal property shall not be suspended, by any limitation or condition whatever, for a longer period than during the continuance, and until the termination of not more than two lives in being, at the date of the instrument containing such limitation or condition, or if such instrument be a will, for not more than two lives in being at the death of the testator. (1 R. S., 773, § 1.) The language is general and comprehensive, and embraces any and every limitation to charity or otherwise, which suspends the absolute ownership and power of alienation beyond the allowed period. There is no more inflexible rule than that a statute, express and unambiguous in its terms, must be held to embrace every case fairly within its purview. In *Williams* v. *Williams* (*supra*), it was conceded to be broad enough to include devises to charitable or indefinite uses; although by an ingenious and plausible course of reasoning the conclusion was reached that the legislature did not intend to include limitations to such uses. It was necessary, of course, in reaching this conclusion, to reason from circumstances *de hors* the plain letter of the statute, and on the assumption that the English law of charity existed here. The argument was this: the rule against perpetuities, as it existed in England, at the time of the revision of the statutes, did not apply to what were recognized as charitable trusts; that it was well understood that gifts to "charities" formed an exception to the operation of the English rule; that the Revised Statutes were enacted with a constant reference to the then existing law, changes not being made for the mere purpose of innovation; that all the legislature undertook to do, was simply to shorten the period of suspension, and not to extend the law of perpetuities to cases to which it had never been applied, and had never been intended to reach; that it was competent to abolish the law

of charitable uses, either wholly or in part, and had it been designed to abolish such gifts altogether, it is inconceivable that it should not have been done in language which would have contained at least some allusion to that branch of the law; that to limit charitable trusts, which in their nature involve the idea of indefinite continuity by two lives in being, is substantially to abrogate them, and this would have been done by express and unequivocal language, had it been intended to do it at all. This line of argument necessarily assumes that neither the revisers or the legislature understood the force or effect of language, or the nature of a " charitable " limitation. The deduction is not from what the legislature did, but from the improbability of the legislative intention, by the use of general language, to substantially abrogate charitable trusts, as this would be the effect by limiting them by two lives in being. The conclusion is jumped at that all the legislature undertook to do was to shorten the period of suspension from any number of lives in being and twenty-one years, to two lives in being, and not to shape a rule that would embrace charitable trusts, to which the English rule against perpetuities, not statutory, but judicial — a gradual growth and creation of the common law, commencing long after the statute of Elizabeth — had not generally been applied. If this be so, and limitations for what are denominated in English jurisprudence " charities," form an exception to our rule, the explicit words of the statute must be disregarded, and the first principles of statutory construction violated. The precise and comprehensive language of the statute is, that the absolute power of alienation of real estate, and the absolute ownership of personalty, shall not be suspended by any limitation or condition whatever for a longer period than during the continuance of not more than two lives in being. There is no exception in favor of indefinite charities. It applies " to every species of conveyance and limitation, whether it be by deed or will, whether it be directly to a party competent to hold property, or indirectly in trust, or to the use of such party, or to one afterwards to come into existence, and whether limited by an executory devise or a springing

use, and whether in the form of a power in trust or a legal express trust." (*Yates* v. *Yates*, 9 Barb., 347.) To import an exception inadmissible by the plain meaning of the language would be to violate the primary principles of statutory construction. The fact that uses, called charitable, were not subject to the English rule against perpetuities, has no proper bearing on the question. Apart from the Thelluson act (39 and 40 Geo. III, ch. 98), making accumulation of income beyond life of settler, or certain minorities, void as to the excess, other restrictions upon perpetuities in England are judicial, the result of cases to be limited and applied as the cases limit and apply them, and as they have not generally been applied to charities, of course those trusts are not within the rule. Here the rule is statutory, and the courts have no discretion. Where there is a statute in England the courts do not hesitate to apply it to charities. The Thelluson act has been applied to gifts to charity. In *Martin* v. *Maugham* (14 Simons, 230), where there was a direction to accumulate until a fund yielded £950 per annum, Vice-Chancellor SHADWELL said that the scheme was founded on "a legal impossibility," but he thought that when a person had expressed his intention to apply property for charity the mode he points out has nothing to do with the question, and he applied it *cy pres*. In a case of charity, if the English rule was statutory, the result there would be the same: The gift itself being void, the fund is applied *cy pres*, that is, without any reference to the particular mode pointed out. The resort to *cy pres* does not save a gift void by statute, but substitutes a legal for an illegal one. Again, in England the limitation of actions in equity was not statutory until the act of 3 and 4 William IV, ch. 27, but the equity judges followed the analogy of the statute limiting actions at law, and they did not apply it to express trusts, or to charitable trusts, which were, therefore, no exception to a statute, but to judicial rule. But, by the act of William IV, the same limitations are expressly applied to suits in equity affecting trusts of land or rents, as to actions at law; and, in a recent case, the precise point was presented for decision, whether the

general terms of the statute, "lands or rents vested in any trustee of an express trust," applied to charitable trusts, and the House of Lords held that they did apply; so that a suit to set aside a conveyance of land held in trust for charity, in violation of the trust, was barred by the same limitation as applied to other trusts or actions at law. The chancellor said: "Charities are trusts, a favored sort of trust, no doubt, but still a charity is a trust, and nothing more. Lord St. Leonards remarked truly that charities *eo nomine* are not mentioned in the statute, and expresses his surprise that that omission had occurred, but that is not material, for trusts generally are mentioned, and that includes charitable trusts, unless they are expressly excepted, and there certainly is no express exception" (*St. Mary's Mag. Coll.* v. *The Attorney-General*, 6 House of Lords Cases, 189); so that in England, as in this State, where a statute is express and unambiguous in its terms, the courts have no recourse but to give full effect to it, holding it to embrace every case fairly within its purview; and neither there nor here, is there any rule of law, not statutory, which can save a devise or bequest to charitable uses, if such devise or bequest be void by a general statute, the resort to *cy pres* in England not saving the gift, but substituting a legal for an illegal one.

I am of the opinion, therefore, that what are "charitable trusts" in English jurisprudence are not excepted from the operation of our statute against perpetuities, and that the restrictions upon the suspension of the absolute power of alienation of real estate and the absolute ownership of personalty apply equally to "charitable" as to all other trusts and limitations. It is believed that not a single case can be found in our books turning upon the validity of the suspension of the absolute power of alienation of real estate, in which it has been held that such power may be suspended in case of a "charitable trust," or any other trust, in any other manner or for any other period than that prescribed by the statute. The trust in *Williams* v. *Williams* was of personal estate alone; but that circumstance is, perhaps, of no controlling influence on the question whether the statute applies to an indefinite

charity. Certainly the language is comprehensive enough to include every description of active trust, whether public or private. In the face of the statute, how can we declare that the legislature did not design to extend the law against perpetuities to indefinite trusts, recognized in the law of England as "charitable?" That it applies to all other trusts is not doubted. Why not to them? The argument (assuming the existence of the English law of charitable uses here) is, that as the effect of limiting charitable trusts by two lives in being is substantially to abrogate them, and this not having been done by express and unequivocal language, it is not reasonable to believe that the legislature intended to subject such trusts (not before subjected) to the operation of the law against perpetuities, and in this indirect way, and without any allusion to that branch of the law, abolish, wholly or in part, the system of indefinite uses. This seems to be hardly a fair way to deal with a statute the plain and explicit language of which scarcely leaves any room for judicial construction; but if it were proper to look away from the statute for the legislative intention, the argument as to such intention fails utterly if, at the time of the revision, the system of indefinite public or charitable uses had not, as I suppose, any place in the law of the State.

If, then, our statute applies to what are recognized in the law of England as "charitable trusts" (and I am of the opinion that it does), it condemns the trust in the present case. Independent of the suspension or perpetuity arising from the contingent character of the devise, it is a trust, by its own express terms, in perpetuity. This is not left to inference or construction, but is so declared. The testator's large estate (amounting in value to nearly half a million of dollars) is, by the terms of the will, never to be alienated, but the property is to be locked up in mortmain for ever. This, however, is the nature of all charitable or indefinite uses. It needs no argument to prove that absolute ownership cannot be predicated of a trust fund which is forever inalienable. Alienation is a fundamental incident of the right of property. He who cannot make a perfect alienation, does not own a perfect

and absolute estate. Our law as to perpetuities in person-
alty declares, " that the absolute ownership of personal estate
should not be suspended " beyond two lives.

*Third.* The trust is void under our statute of uses and
trusts. All express trusts of land, except those enumerated
in the statute, are abolished, and the trust in question is not
among those enumerated. (1 R. S., 728, §§ 45, 55.) Hitherto
there has been a diversity of opinion, and possibly still is,
amongst judges, whether the statute abolishing trusts applies,
or was intended to apply, to a trust for a public or charitable
purpose, although the preponderance of opinion has always
inclined towards a construction giving to the emphatic and
comprehensive words of the statute the fullest effect. It has
been always supposed, by a majority of the judges that have
had occasion to construe the statute, that when the legisla-
ture declared that " uses and trusts, except as authorized and
modified in this article, are abolished," the abolition was of
all uses and trusts of lands, except those which the statute
allowed; and that an express trust, if enumerated in the
statute, was valid, but if not, was illegal and void, unless
capable of execution as a power in trust. On the other
hand, it has been thought by some, that the article " of uses
and trusts" relates only to private trusts, and that it was
not intended to affect charitable uses or public trusts. The
words of the statute give no countenance to this view of the
question. A charity is a trust, and nothing more — an active,
express trust — known to the English law, it is true, distinct-
ively as a *public* trust. It is not to be presumed that the
legislature were unaware of this distinction, or that in author-
izing certain express trusts and abolishing all others, trusts
for charity were not in the legislative mind. The whole sub-
ject of charitable trusts had been exhaustively discussed in
the same senate which passed the statute of trusts and per-
petuities, sitting as a court of errors, in the case of *McCartee*
v. *Orphan Asylum* (9 Cow., 439), by Chancellor JONES, who
examined the subject with exceeding ability, calling attention
to the distinction between charitable and other trusts, the
policy of mortmain, and of prohibiting trusts for charity, as

is done in England by 9 Geo. II, chap. 36. In the sweeping abolition made by the revision, the legislature and the revisers evidently understood that there was such a thing in the English law as a use and trust of a public and charitable nature, and that in England the law of charities had been and was an extensive branch of equity jurisdiction. Indeed, in my view, the statute of uses and trusts is only another and further illustration of the symmetry and harmony of our law. Our public trusts or charities rest upon legislative authority, in creating and authorizing corporations with appropriate mortmain restraints. These, in a just sense, do not create trusts at all, or if they do, the legislature authorizes them, and in so doing modifies, in each instance, the general law of uses, trusts and perpetuities. But the question whether the statute applied, or was intended to apply, to a trust for a public or charitable purpose, ought now to be deemed at rest in this court. In *Downing* v. *Marshall* (23 N. Y., 366), the testator devised the residue of his real estate to his executors in trust for charitable objects. It was held that as an express trust it could not be sustained, the statute having abolished all trusts of that description except certain ones enumerated therein. The trust limitation, however, was upheld as a power in trust, the title descending to the heirs of the testator subject to the power. This would seem to settle the mooted question, whether the statute had worked an abolition of all express trusts, except those specifically mentioned in it. It is clear that the trust in the present case, cannot be sustained as a power in trust. It does not authorize the performance of any act which may be lawfully performed under a power, as powers are regulated, defined and limited by our law; and it is neither a general or special power under the statute, because it does not contemplate the alienation or disposition of lands. A power is defined to be an authority to do some act in relation to lands, or the creation of estates therein, or of charges thereon, which the owner granting or reserving such power might himself lawfully perform. It is general or special, beneficial or in trust; general when it authorizes the alienation in fee, by means of

a conveyance, will or charge of the lands embraced in the power to any alienee whatever; special, when the persons or class of persons to whom the disposition of the lands under the power is to be made or designated, and when the power authorizes the alienation by means of a conveyance, will or charge of a particular estate or interest less than a fee. (1 R. S., 728, § 53; id., 732.) Manifestly, the limitation being considered could not take effect as a power in trust. This objection to the validity of the trust, of course only applies to the devise of the lands within this State, but they constitute much the largest portion of the property designated by the testator for the charitable foundation. This disposition being invalid it will so far interfere with the scheme of the will, and the intention of the testator, that the trust must fail altogether.

*Fourth.* The subjects of the trust are the real estate (Monticello) in Virginia, and real and personal estate in New York. The validity of the devise of the land in Virginia depends on the law of that State. As to the estate, real and personal, in New York, it depends on the law of New York, because, as to the real, New York is the *locus rei sitæ;* as to the personal, the *locus domicilii.* The law either of Virginia or New York being hostile to the limitation, it is, I think, wholly void. The testator's plan embraces and requires *all* the property. If Monticello be subtracted, the site of the institution is gone, and it cannot be said that the testator would have founded it anywhere else. If Monticello remain, but everything else is subtracted, then there are no funds to erect, endow and maintain the school. In short, the scheme is indivisible, and must wholly stand or wholly fail. It was proved upon the trial and found as a fact by the judge, that, according to the law of Virginia, a trust in lands, such as the one in question, is void. This finding is conclusive. The trust failing as to Monticello, it must fail altogether. That was the prescribed site, and the trust cannot be varied in this respect. All the other estate given, is given in exact words to found and maintain the school at Monticello, and there is no discretion to apply any portion

of the fund to the purchase of some other site for the purpose in question.

My conclusions are, that the devises and bequests of the residue of the real and personal estate of the testator (being the lands and personal estate in New York), upon the trust specified in the will, are invalid for the reasons, 1st. That the disposition violates legal rules, in that the gift is for an indefinite object, and the beneficiaries are uncertain and unascertained. This objection would be fatal in the State of Virginia, where the whole object of the devise was to be promoted, and where the will was to take effect, for the purposes designated by the testator, if it took effect at all. In that State, charitable devises and bequests stand upon the same footing as all others. (*Gallego's Ex'rs* v. *The Att'y-General*, 3 Leigh, 450; *Brooks* v. *Shacklett*, 13 Grat., 301.) 2d. There is no competent trustee designated by the testator in the first instance, to take and administer the charity, even if it be true that by the law of the State trusts for charities, so called, may be maintained when a competent trustee is named in the limitation. 3d. The disposition creates a perpetuity, and for that reason falls under the condemnation of our statute against perpetuities. 4th. The bulk of the property devised and bequeathed (the lands in this State) is subjected to a trust that cannot legally be created. 5th. The devise of the farm and estate at Monticello, in Virginia, the designated site of the school, is by the law of that State void. By the law both of New York and Virginia, the trust limitation is invalid. It were quite enough, however, that the law of this State is in hostility to it. The trust failing as to the real and personal estate in New York appropriated to erect, endow, and maintain the school, the devise of the Monticello farm in Virginia, as the site for the institution, fails also. The purpose and intent of the testator cannot be effectuated, and therefore, every part of the scheme fails.

I cannot say that I regret this result. The purpose may be, in a general sense, charitable, but the plan for carrying it out is manifestly impracticable, not to say impossible. Aside from incapacity, there is a manifest unfitness in the govern-

ment of the United States, or the State of Virginia, becoming the trustee or administrator of a fund donated by an individual for the furtherance of an object in no way pertaining to the administration of those governments. With regard to the trust to the Hebrew societies, it is so utterly vague and indefinite that it could not be executed in the English chancery without invoking its *cy pres* power: a power in case of charity, as has been held by this court, having no existence in the jurisprudence of this State. (*Beekman* v. *Bonsor*, 23 N. Y., 298.)

The judgment of the General Term of the Supreme Court should be reversed, and the judgment of the Special Term affirmed.

Judges Dᴀᴠɪᴇs and Pᴏʀᴛᴇʀ concurred in the foregoing opinion of Judge Wʀɪɢʜᴛ. Judges Dᴀᴠɪs and Bʀᴏᴡɴ concurred in holding that the trust failed under the laws of Virginia, without passing upon the question as to its validity as a charity under the laws of New York. Bʀᴏᴡɴ, J., was also of opinion that the United States was incompetent to take as devisee for purposes of general charity. Judge Pᴏᴛᴛᴇʀ concurred in opinion with Judge Davis, but expressed his dissent from that portion of the opinion which held the trust void under the laws of New York. Dᴇɴɪᴏ, Ch. J., and Cᴀᴍᴘʙᴇʟʟ, J., dissented.

The judgment of the General Term was reversed and judgment of the Special Term affirmed.