Merrimack, }
  Dec., 1900. }

HAYNES *&amp; a.* v. CARR *&amp; a.,* EX'RS.

Where a will commits the residue of an estate to trustees, with instructions to expend the income thereof, "in their discretion, in such sums, at such times, and in such manner as may seem to them advisable," the trustees are vested with discretion as to the expenditure of the income and the administration of the details of the trust, within the specified limits, but not as to the disbursement or retention of the fund.

A charitable gift is not invalid because the proportion thereof to be enjoyed by various beneficiaries is not fixed, and the several parts of the trust are to be administered together, the income to be divided in the discretion of the trustees.

A charitable gift is not void for indefiniteness when the general purpose of
the bequest may be effectuated by judicial decree, and the trustees are
vested with a continuing discretion as to the selection of particular objects
of the testator's bounty.

A provision that the income of an estate is to be expended for the benefit of
the poor and destitute in the state, and for charitable and educational pur-
poses therein, is not void because no specific beneficiaries are designated,
and does not vest the trustees with power to apply the fund to purposes not
charitable.

In this state courts of equity have original and inherent jurisdiction over
charitable trusts, independently of the statute of 43 Elizabeth.

The statute limiting the power of non-dividend-paying, voluntary corpora-
tions to hold property is not applicable to eleemosynary trustees.

BILL IN EQUITY, by the heirs of the late John H. Pearson,
praying for a decree declaring a trust created by his will void.
The defendants are the executors of the will and the attorney-
general of the state. The executors have filed an answer, which
they ask to have considered as a cross bill, in which they pray for
advice and direction as to their duty in respect to the clause of
the will in question.

By the will and codicils, after certain provisions for the testa-
tor's widow and his nephew and niece, the residuary estate is
converted into a trust for various private and public purposes, in
the following words and figures : " Item 7. I give, bequeath, and
devise all the rest, residue, and remainder of my estate, of every
description, to the trustees hereinafter named, and their successors,
in trust forever, for the following uses and purposes." Then fol-
low seven clauses setting forth various specific purposes, the val-
idity of which is not controverted, but disposing of only a small
portion of the trust estate. The balance is then devoted to pub-
lic charity, as follows: " (8) *To expend,* in their discretion, in
such sums, at such times, and in such manner as may seem to them
advisable, *the income* of 'my said estate remaining after the pay-
ment of all charges thereon created by and under this will, and
all other legitimate charges against my said estate, for the benefit
of the poor and destitute in said state of New Hampshire, and
for charitable and educational purposes therein." The same per-
sons are nominated executors and trustees.

The plaintiffs allege that the trust so attempted to be created
is void in law, and that the property thereby attempted to be con-
veyed belongs to them as the heirs of the testator and should be
distributed among them accordingly. The defendants deny these
allegations, and allege that the trust is valid, and that, upon the
settlement of their account as executors, the property included in

the trust should be paid over and transferred to the trustees named in the will.

The estate which will become subject to the trust provisions, if valid, will amount in value to several hundred thousand dollars. The bill, answer, and copies of the will and codicils may be referred to in argument.

*Oliver E. Branch* and *John Haynes* (of California), for the plaintiffs. Courts of equity in this country are not vested with the extraordinary powers exercised by the court of chancery in England, among which are "prerogative powers," which, under a legal fiction, are said to have been vested in it; that is, that the chancellor, as the "keeper of the conscience of the king," who, as *parens patriæ*, has the supervision of all charities is competent to administer certain charities, and to devise "schemes" for the disposition of charitable estates, which he could not do sitting as a court of chancery. The court of chancery in England exercises not merely judicial powers, but sovereign powers, as representing the king, who is held to have a general superintendence of all charities. In this country the sovereignty, whose visible head in England is a king, is the people; and if there is any power in the state representing the people, which has or may have a general superintendence over all charities, it is the legislature. Our courts of equity rightfully exercise judicial functions only; and the supreme court of New Hampshire, never having been given prerogative or sovereign powers, if indeed the legislature could bestow them, cannot undertake to set up "schemes" for the distribution of charities, or cure fundamental defects in wills where charitable trusts are attempted to be created.

The attorney-general does not stand as *parens patriæ* in the administration of justice and in the organization and operations of the government. He is simply the law officer of the state. The designation *parens patriæ* in the English law was used to express the idea of the king as the visible fountain in the state from which all streams of beneficence flowed,— the father of the people, who, in the exercise of a system of paternalism, could, as a sovereign act, take over to himself the administration of any and all charities; and in case they were such as the court of chancery could not, in the exercise of its judicial or chancery powers, take cognizance or jurisdiction of, it could under the implied sanction of the king, or by his prerogative. It is a novel theory, indeed, that the attorney-general in New Hampshire, or in any American state, stands as *parens patriæ*. As well might it be said that the attorney-general in England occupies such a position. The attorney-general, as the law officer of the state, may, upon

information, and perhaps of his own motion, invoke the equity powers of the court for the enforcement or supervision of charitable trusts; but there is no authority anywhere, and no principles upon which it can be asserted, that the attorney-general as *parens patriæ* can administer charities, much less supply defects in wills creating charitable trusts, by inventing or carrying into effect "schemes" for the application or distribution of charitable bequests. Chapter 17 of the Public Statutes defines his general duties, and the court will look in vain there, or in article 45 of the constitution, for his official authority or capacity to assert the imperial powers of the English sovereign over public charities, or to aid the court in the performance of extra judicial functions. Undoubtedly he could enforce the execution of the trust upon the relation of some beneficiary; but this does not obviate the legal necessity of a defined beneficiary, who may directly, or through the intermediary of the attorney-general, enforce the execution of the trust by the courts.

In England the king is the *parens patriæ*, and, as the parent of his people, has the general superintendence of all charities. In this country the legislature of the state is the sovereign power, and the *parens patriæ*. *Attorney-General* v. *Flood*, Hayes Exch. 630; *Attorney-General* v. *Lady Downing*, 1 Wilm. 32; *Wheeler* v. *Smith*, 9 How. 55, 78; *Fontain* v. *Ravenel*, 17 How. 369; 4 Kent 508, note.

The statute of 43 Elizabeth, chapter 4, was a local statute, applicable to England only, and never in force in New Hampshire. *Perin* v. *Carey*, 24 How. 465. Upon authority, as well as upon reason, it may be positively asserted that the statute of 43 Elizabeth was never in force in New Hampshire, nor in any of the states of the American Union, unless adopted by legislative action. In some of the states,— Virginia, for example,— the legislature, supposing the statute to be in force, expressly repealed it; but the rational conclusion from such action is that the statute was deemed inappropriate and unsuited to the condition of the people of that state, or that it was inherently unwise; or, not being in force, it was wise to remove all possible doubt, and thus prevent any judicial misinterpretation upon the subject of its existence in that state.

The beneficiaries under this assumed trust are so indefinite and uncertain as to render it incapable of administration and therefore void. There are named three distinct and separate charities, or charitable uses or purposes : (1) For the benefit of the poor and destitute in the state of New Hampshire; (2) for charitable purposes therein; (3) for educational purposes therein.

In *Levy* v. *Levy*, 33 N. Y. 97, it was said : "If there is a single postulate of the common law established by an unbroken line of

decision, it is that a trust without a certain beneficiary, who can claim its enforcement, is void, whether good or bad, wise or unwise." The authorities sustaining this proposition are uncontradicted, though there are English cases apparently in conflict with it, where, under the king's prerogative, charitable trusts, though void at common law, were sustained by the lord chancellor as the representative of the king; and American cases are found where the courts have blindly, and without regard to our form of government and the absence of kingly prerogatives, followed them, not distinguishing even between the decrees of courts of equity, in the exercise of their judicial powers, and those of the lord chancellor as the keeper of the king's conscience, and through whom, usually, the king exercised his prerogative powers.

If power were given the executors to select the beneficiaries, it does not obviate the objection that the testator omitted to designate them in his will. Unless they are so defined and limited that a court of equity can determine from the will itself how the charity is to be administered, it has no power to enforce the execution of the trust. The validity or invalidity of the trust does not depend upon the will of the trustee. The discretion here given the trustees will be noticed in another connection. The point we make now is that there are no beneficiaries so named or described in the will as would authorize them to come into this court and compel the execution of the trust, nor such identification of them as would authorize or enable the court upon the application of any one to compel its execution. If these trustees were to-day to present to this court a certain, definite scheme of administering the trust, particularly describing and defining each class of beneficiaries and each beneficiary of each class, so that if such scheme had been fully stated in the will it would be entirely unobjectionable as a valid trust to charitable uses, it would avail nothing. All this must appear by the will. *Adye* v. *Smith,* 44 Conn. 60 ; *Bristol* v. *Bristol,* 53 Conn. 242 ; *Woodruff* v. *Marsh,* 63 Conn. 125 ; *Williams* v. *Williams,* 8 N. Y. 525 ; *Dodge* v. *Pond,* 23 N. Y. 69 ; *Holland* v. *Alcock,* 108 N. Y. 312 ; *Read* v. *Williams,* 125 N. Y. 560 ; *Fosdick* v. *Hempstead,* 125 N. Y. 581 ; *Tilden* v. *Green,* 130 N. Y. 29 ; *Dashiell* v. *Attorney-General,* 5 H. & J. 392, — *S. C.,* 6 H. & J. 1 ; *Wilderman* v. *Baltimore,* 8 Md. 550 ; *Rizer* v. *Perry,* 58 Md. 112 ; *Yingling* v. *Miller,* 77 Md. 106 ; *Literary Fund* v. *Dawson,* 10 Leigh 147 ; *Holland* v. *Peck,* 37 N. C. 255 ; *Hester* v. *Hester,* 37 N. C. 330 ; *Brennan* v. *Winkler,* 37 S. C. 457 ; *Green* v. *Allen,* 24 Tenn. 170 ; *Webster* v. *Morris,* 66 Wis. 366 ; *Barnes* v. *Barnes,* 3 Cranch C. C. 269.

The discretion of the trustees, if it applied to the object of the trust, is wholly unrestricted. No scheme for administering the trust

is indicated in the will, and therefore this court would be powerless. to administer the trust or to compel its administration. Suppose the trustees should go on for ten, twenty, or fifty years accumulating the income from the trust estate, and some one should assume that he had a right to file a bill in this court to compel the execution of the trust, what decree could this court make? The complainant could not devise a scheme and ask the court to enforce it. He would be met by the same answer given us here by the trustees,— that the scheme or mode or manner of administering the trust rested in their discretion, not in that of the complainant or the court; and if the court should assume the power of issuing a mandate to compel them to devise a scheme and submit it to the court that it might compel its execution, they would reply that the time as well as the manner of administering the trust was in their discretion and not in that of the court. Or, if the trustees should to-day devise and publish a definite scheme for administering the trust in which the beneficiaries were fixed and described with absolute certainty, so that a complainant, whose right could not be questioned, should ask this court at a future day to compel its execution, the trustees might well answer that the discretion vested in them was a continuing one, and was not exhausted by the adoption of the scheme so published, and that they had abandoned such scheme and had adopted another in which the complainant had no interest whatever; or that the new scheme contemplated the accumulation of the fund for a definite time which had not expired.

So if the fund should be fraudulently converted by the trustees to their own use, what beneficiary is so designated in the will as to enable him to invoke the power of the court for the preservation of the fund? Or if it be conceded that the attorney-general could, on behalf of an indefinite and unascertained person or number of persons, assumed to be beneficiaries under said trust, ask the court to remove the trustees who had wholly failed to · administer the trust or were converting the fund to their own use, and to appoint others in their stead, and assuming, further, that the court could for such cause remove them and appoint others, it is evident that the trustees so appointed could not, nor could the court, exercise the discretion vested by the will in the trustees appointed by the testator, or those who should succeed them in the manner provided in the will. The appointment of the successors of the present trustees, as well as the administration of the trust, is confided by the testator in the trustees named in the will and their successors, as a personal confidence not given to the court or to any other authority or person.

These considerations show conclusively the necessity of a trust,

charitable or otherwise, being so definite and certain that the court can compel its execution by the trustees appointed in the will; or, in case they are removed for maladministration, that the court can appoint trustees who will execute it. No trust for charitable uses which vested in the trustee an absolute and uncontrolled discretion ever was or ever could be administered under the direction of a court of equity, acting judicially, because of the absurdity of a court directing the trustee to do as he pleased,— to exercise his own discretion; and because no one whose only right depended upon the uncontrolled will and discretion of another could show any ground upon which the action of the court could be invoked. It was because of this impossibility that the king's prerogative was invoked to take away and prevent the exercise of a discretion by the trustee which could not be controlled by the court, and to specify a definite charitable use, the administration of which could be controlled and enforced by the court. This court cannot, in the exercise of its judicial powers, frame a scheme for the administration of this most indefinite trust. The almost unlimited discretion vested in the trustees is not vested in this court or any other.

The trust for "educational purposes" is equally general, indefinite, and uncertain, and equally incapable of enforcement under the direction of the court. How shall it be administered? Shall the trustees select children, or young men, or young women, to be educated at some specified school, college, or university? If so, how shall the selection be made? Or shall they establish a school; and if so, what kind? Shall it be a university, a college, a classical school, an agricultural school, a mechanical school, or a kindergarten? Shall it be for the promotion of education among all classes, high, low, rich, or poor, or shall individuals be selected? A thousand and one modes of promoting education may be suggested. Which of them was intended by the testator? Which of them, if the trustees should neglect or refuse to adopt any of them, could the court compel them to adopt? What individual institution, association, or corporation could come into this court and assert that he or it was a beneficiary under any of these trusts, and compel the trustees to grant relief, or execute these trusts, or any of them? These are questions that must be answered by reference to the will itself, or to some statute of this state, and not by referring it to a commission under the statute of Elizabeth, or to the prerogative powers of the king of England, whether exercised under his "sign manual" or by the keeper of his conscience, the lord chancellor, or by the *cy pres* power, which was but an assumed exercise of the power of the lord chancellor as the personal representative of the king; for no other power could give validity to a devise or bequest that is void for uncertainty. In the

absence of a statute giving this court the power to sustain and execute a bequest to charity which is void at common law for uncertainty, there is no difference between the exercise of such power and the sustaining and executing a will not executed with the formality which the statute requires. In either case the bequest is void, and no judicial power can give validity to either. "A void thing is as no thing," and nothing short of creative power can make it something. If it be said that the intention of the testator to devote his estate to charity justifies the court in giving validity to a bequest to charity generally, you are but going across the sea and invoking the power of the king, to whom we were once subject, to administer this trust. If the intention of the testator, expressed in terms so general and ambiguous as only to justify the conclusion that he intended to establish some charity, must be executed by a court of equity because an intention of that kind was manifested, why not execute a bequest to a specific charity clearly and explicitly expressed in a will signed by him, but not executed in the manner required by the statute?

We have considered the discretion of the trustees upon the theory that it relates to the selection of the beneficiaries, and have shown that in that view the trust is void for indefiniteness and uncertainty. The discretion here given the trustees, however, qualifies the power " to *expend* " the income of the trust fund, and not the selection of the beneficiaries. The language is not that the trustees shall expend the income among such of the poor and destitute, and for such charitable and educational purposes, as they may, in their discretion, select, though that power, as we have seen, would not validate the trust. It is obvious that the expressions, " in such sums, at such times, and in such manner," do not refer to the selection of a class of persons falling within the description of "poor and destitute," nor of one or several charities, nor of any specific way in which education may be aided or promoted, but to the manner of expending of the income. The amount, the time, and the manner of expending the fund is left absolutely and uncontrollably in the discretion of the trustees, if they, in their further " discretion," decide to expend it all, which means that they may expend it or not as they see fit. *Holland* v. *Alcock*, 108 N. Y. 312; *Cochran* v. *Paris*, 11 Grat. 356; *Gibbs* v. *Rumsey*, 2 V. & B. 294; *Vesey* v. *Jamson*, 1 Sim. & S. 69; *Fowler* v. *Garlike*, 1 Russ. & M. 232.

*Francis J. Heney* (of California), for the plaintiffs. This court has laid down the true rule with absolute accuracy in the case of *Goodale* v. *Mooney*, 60 N. H. 528, that in addition to imperative words of trust, and a certain subject, there must be an

equally certain object.　The confusion in the different cases arises almost wholly from the inaccurate uses and loose definitions by the courts of the word "object," as above applied.

Courts of equity naturally perceived that there must be some certainty of some kind about a charitable trust, or it would be impossible for the court to enforce it.　It was no part of the inherent power of a court of equity to dispose of any part of a testator's property according to a scheme or plan of its own, or to individuals or objects elected according to the individual conscience of its judges.　Originally that court merely undertook to carry out the intentions of the testator, if they were sufficiently certain in any respect to enable the court to determine the particular thing which the testator intended and desired to have done.

Obviously, if a testator directed in his will that his trustee should expend the fund in the foundation, erection, or support of a designated kind or character of institution, such as an asylum, a hospital, a dispensary, a reformatory, or a university, at a specified place, it would not be necessary for him to specify in his will either the individuals or the class of individuals who are to receive the benefits of his gift, nor even a plan by which such beneficiaries shall be selected, nor even to expressly authorize his trustee to select the individuals who are to receive the benefits of his charity. The nature of the charity itself had already been so specifically described by the testator that a court of equity could proceed with unerring certainty to carry out his intentions by enforcing the execution of the trust by the trustee.　All the details of the management of any of such institutions, and the power to originate the plan or scheme by which the individuals are to be selected who are to enjoy the benefits of the same, may well be left to the trustee under the direction and control of the court.

It must be evident that there are three distinct elements of certainty and uncertainty in relation to the object in every will.　First, the testator may be certain as to the nature of the charity to which he desires to have his property or its income applied; and after he has specified the nature of the charity with as much definiteness as he has specified the subject of the trust, the testator may be entirely indifferent as to what individual or individuals may receive the benefit of the trust, except only that it shall be the public generally or some limited part thereof, to be determined by a plan or scheme which the testator is entirely willing to leave to either the trustee or the court.　Many examples of this kind of trust can be found in the books, as, for instance, where the testator declares that he desires the trustees to found or establish a hospital, or a college, or a home for the poor and destitute, or a museum, or a public library, or a public park.　In all these instances the object

of the trust is "as certain as the subject." It is the intention of
the testator that an institution of the kind designated by him in
the will shall be established, that the rules of admission to the
same shall be such as are ordinarily adopted for such institu-
tions, and that the character of the benefit to be received by the
beneficiaries shall be that which is usually and ordinarily conferred
or bestowed in such institutions. The intention of the testator is
clear and manifest. No mistake can possibly be made by the court
in relation to the same. Yet "the nature of the charity" may be
said to have been designated or described by the testator in general
terms only.

The testator may be certain as to the particular individuals or
class of individuals whom he desires to receive the benefit of his
property, and may be absolutely uncertain and entirely indifferent
as to the nature of the charity, that is, as to the character of the
benefit which those individuals are to receive, or as to the plan
upon which it shall be bestowed. In all this class of cases, if the
nature of the charity — that is, of the benefit which is to be con-
ferred upon the beneficiaries — is left to the continuing discretion
of the trustees and their successors, then it necessarily follows that
unless the number of the beneficiaries is so limited by law or by
the very nature of the case that the court can distribute the income
among all the individuals composing the class designated as bene-
ficiaries, if the trustees fail to carry out the trust in good faith,
the trust is too indefinite and uncertain for the court to unerringly
enforce the intentions of the testator. The same rule applies if
the property, instead of the income, is to be distributed to or among
the same classes. In all this class of cases the trust is void *ab
initio* unless the discretion of the trustee to select is limited to a
single act, *i. e.*, to a decisive and permanently lasting and unchange-
able selection when once made, and in such a case the trust lapses
and the property reverts to the donor or his heirs if the trustee dies
without making such selection. If the number of the beneficiaries
may be so large and indefinite that it is not practicable for the
court to determine who they all are, and if the discretion of the
trustees and their successors to select is continuing and perpetual,
and if no plan is furnished by the testator' in his will for selecting
the beneficiaries, or for administering the trust, and if the nature
of the charity has not been declared in the will, how is it possible
for the court to carry out or enforce the intentions of the testator?

The testator may furnish the general plan or scheme for the
administration of the trust, and. may be entirely indifferent as to
the nature of the charity or character of the benefit which may
thereby be conferred or bestowed upon the beneficiaries. If this
general plan or scheme of administration is sufficiently definite to

be practically enforced with a reasonable degree of certainty by the
court, the trust is valid, whether the discretion to select the bene-
ficiaries is a continuing one, and whether the selection is to be made
from a very large and indefinite number, or not.   Obviously, the
court can carry out the plan or scheme of administration and thus
effect the intention of the testator equally as well as the trustee.

The trustees are certainly given full power to determine the
amount of money — that is, the proportion of the income — which
shall be expended by them for any one of the three purposes.
Hence they may expend the entire amount for any one of these
purposes.   The decisions are unanimous upon this point.   This
being true, it necessarily follows that if any one of the three pur-
poses enumerated is too uncertain or indefinite to be enforced, the
entire trust clause is void for uncertainty.   It is upon this princi-
ple that the courts have uniformly held that if the trustee has the
power to apportion the fund according to his discretion, and if he
is authorized under the trust to expend any part thereof for a pur-
pose which is not strictly a legal charity, the entire trust must fail.
*Morice* v. *Durham*, 9 Ves. 399; *James* v. *Allen*, 3 Mer. 17.

The words "in their discretion" grammatically and naturally
modify the verb "to expend."   Their position in the sentence
makes it clear that they were intended to modify and apply to the
words "to expend," and no others.   They make good sense in that
connection, and hence they cannot be transposed.   In that connec-
tion they can have but one meaning, to wit, that the testator
intended to give the trustees power to expend, or not to expend,
according to their discretion.   He could not have intended that
the words should apply to the amounts or the times or manner of
the expenditures, because he has distinctly and expressly used other
words which fully cover those points; and hence, if the rule is to
be followed that, "if possible, effect is to be given to every word,"
we are bound to give the words "in their discretion" the meaning
that the trustees may expend or not as they see fit.   Unless this
meaning is given to the words "in their discretion," it necessarily
follows that the words "in such sums, at such times, and in such
manner as may seem to them advisable," could all have been
omitted without detracting one iota from the meaning of the para-
graph as it stands.   In order to give every word a meaning, we
repeat, the words "in their discretion" can have no other meaning
than that which we claim for them.   If we are correct in this con-
tention, then the language of the will vests the trustees with an
uncontrollable discretion to expend or not to expend, which no
court of equity can enforce or will undertake to enforce.   Even
if the words "in their discretion" are transposed to the end of the
sentence, they could not be given the meaning contended for by

the plaintiffs without straining and absolutely changing their natural and ordinary meaning. An inspection of this will shows that the testator, or the writer thereof, selected and weighed each word with unusual care and with a fine sense of discrimination, and that he arranged them so as to express the exact meaning which he had in mind and none other.

The testator does not say that the trustees are to expend for the benefit of poor and destitute persons in the state of New Hampshire, but he explicitly states that they are to expend "for the benefit of *the* poor and destitute in the state of New Hampshire." In other words, he does not desire the trustees to expend the income of the trust property for the benefit of some of the poor and destitute in New Hampshire, who are to be selected by said trustees, but for the benefit of the entire class of poor and destitute in the state. The words quoted clearly comprehend not only a distinct class, but the whole of said class. Similar words have been uniformly so construed, both in this country and in England. The word "the" is a definite article, and particularizes the subject spoken of and to which it is applied. Evidently the testator had in his mind something ascertained and known,— a class of persons which he designates as "*the* poor and destitute" of his state; but he has failed to furnish us with a rule by which the court can ascertain all whom he intended to include in the class to which he refers, and that class is too large and indefinite for the court to divide the income continually among them all, in the absence of a specific rule of determining them. The language of the statute of 43 Elizabeth is for the "relief of the poor." The language of this will is "to expend for the benefit of the poor and destitute." Clearly, this does not necessarily confine the trustees to a distribution of the income to that class of beneficiaries. The words "for the benefit of" are not necessarily the equivalent of the words "relief of."

It is admitted that courts of equity in England possessed inherent power prior to the statute of 43 Elizabeth to enforce charitable trusts; but it is not admitted that these courts of equity possessed inherent power, either prior to the statute of 43 Elizabeth or subsequent thereto, to enforce a charitable trust if it was uncertain in any one of the essential elements described in the rule for which we contend; and it is not admitted that these courts of equity possessed inherent power, either prior to the statute of 43 Elizabeth or subsequent thereto, to vary the use of a charitable trust. On the contrary, we insist that in England, both prior and subsequent to the statute of 43 Elizabeth and down to the date of the declaration of independence by the colonies, the king alone had power to specify the charitable purpose to which a fund should be

devoted, if the testator attempted to give it to charity, and failed to make his purpose sufficiently certain and definite to be enforced; and that the king alone could vary the use of a charitable trust.

In England, the title of property which has been devised or bequeathed to a mistaken charitable purpose, or to charity generally, with so much uncertainty and indefiniteness that the particular intent or object of the testator cannot be determined by a court of equity with reasonable certainty, vests in the king very much in the same manner as does the title in wreck, in treasure trove, in waifs, and in estrays. In all these cases the title to the property is treated as having passed out of the owner and as having vested in the king as a prerogative of the sovereign. The king may grant these prerogative rights in wreck, treasure trove, waifs, and estrays to others, just as he may appoint the particular object to which an uncertain or "lost" charitable trust property shall be devoted.

In the United States, in the absence of a statute to the contrary, treasure trove, waifs, and estrays belong to the finder. So as to trust property devised or bequeathed by the testator to an indefinite object, the prerogative title of the British crown vests primarily in the heirs of the testator, in this country, just as the title to treasure trove, waifs, estrays, and wrecks vests in the finder, unless the legislature has otherwise expressly directed and declared. Such a disposition of the property is obviously more in accordance with the genius of our institutions. The legislature, as the successor to the prerogative powers of the king, has the undoubted right and power to itself seize the title to all such trust property, and to declare how and to what particular object it shall be devoted; but in the absence of any such express declaration by the legislature, such property must unquestionably be treated as property of which the testator died intestate, and it must be distributed in accordance with the statute or legislative declaration in such cases made and provided. It is true, perhaps, that the legislature could authorize the court to appoint the particular object to which such trust property should be devoted, but it has not done so in this state, as we shall see. Jurisdiction to determine the title to treasure trove, waifs, estrays, and wrecks does not vest the court with any of the prerogative powers of the British crown with respect to such property, and neither does jurisdiction over charitable trusts do so.

It is true that the king usually exercised his prerogative power to designate the particular purpose to which a charitable trust devised to an indefinite object should be applied, under his sign manual, through the chancellor; but he not infrequently gave personal directions as to the application of the fund. When the king exercised this prerogative power, which he possessed as curator of all charities and as *parens patriæ*, to devote an uncertain and indefinite

charity to a specific object, or to vary the mistaken use of a charity, by his sign manual, through the court of equity, the chancellor acted in an administrative capacity merely, as the agent of the king as curator, and not in a judicial capacity.

It would therefore seem to be a matter of indifference, in so far as the decisions of this court ought to be enforced thereon, whether the statute of 43 Elizabeth became a part of the common law of this country or not, except in so far as it serves to define the several kinds of objects which are to be considered charitable whenever they are designated by the testator with sufficient particularity and definiteness to be enforced. The statute expressly conferred upon certain commissioners the power to investigate the conduct of all charities by the trustees to whom they had been originally entrusted, and to provide a proper scheme for the administration of such trusts when the commissioners found that they had been improperly conducted. The statute also gave the lord keeper, not as a court of equity but in his personal capacity, the power to revise the action of these commissioners. The English cases which were decided subsequent to the statute show clearly that the courts did not consider it within the power of the commissioners to vary the use of a mistaken charity, or to devise a scheme of administration for an uncertain charity. The commissioners were only authorized to carry out the intention of the testator as definitely expressed in the will, if the original trustees were not already doing so; and the lord keeper had power only to revise such action of the commissioners in a ministerial capacity and as the personal delegate of the king.

The rule of *cy pres* was originally devised to defeat the testator's intention rather than to carry it out. It grew out of those devises which the narrowness of sect prejudices in England pronounced illegal, and the prerogative of the king as curator of all charities was invoked to divert the fund from the positive, expressed intent of the testator to an entirely contrary, and, to him, perhaps, a most undesirable object. The sign manual of the king was an express written direction to the chancellor in his personal capacity to act as the agent of the king in designating the object of the charity in the particular case to which the sign manual was addressed. This prerogative power of the king is vested in the legislature in this country.

From these principles we are bound to conclude that the provision in the constitution of New Hampshire, which confers upon this court jurisdiction over charitable trusts, cannot be construed as an implied grant of sovereign power and of the prerogative power of the legislature, as distinguished from strictly judicial power. In other words, that provision of the constitution cannot be

construed as a grant of power to this court to exercise the former
prerogative power of the king of England, to select an object or ob-
jects to which a trust fund shall be devoted when the testator has
given to charity generally, but in such uncertain and indefinite
language that the court cannot judicially determine either the par-
ticular nature of the charity or the beneficiaries whom the testator
intended to receive the same. The constitutional provision in
question is a grant of strictly judicial power, and that alone.
Under it the court has full power to determine whether a chari-
table trust is too uncertain and indefinite to be enforced or not.
If its finding upon this question is in the affirmative, the sentence
of the law is, and the decree of the court must be, that the trust
is void. So far the court can go, but no further. Having done
this much, its judicial power is exhausted.

The policy of the laws of New Hampshire forbids the holding
of property for charitable purposes, in the hands of a single set of
individuals, in any amounts in excess of the sum of five hundred
thousand dollars. The legislature of this state has expressly de-
clared that any five or more persons of lawful age may associate
together by articles of agreement to form a corporation for chari-
table purposes. P. S., *c.* 147, *s.* 1. Section 8' of the same chapter
provides that if a division of profits to stockholders is not an ob-
ject of a corporation, it shall not hold property exceeding in value
the sum of five hundred thousand dollars. Could any more ex-
plicit expression of the policy of the people of this state in regard
to charitable trusts, when held by corporations, be written? This
applies solely to corporations and not to individuals, in so far as
the express language of the statute is concerned; but "equity fol-
lows the law."

Hence, if it appears that the general policy of the law of this
state is to prevent a single set of individuals, whether acting in
their own names or under the name of an artificial being composed
of themselves, from holding property in excess of the amount fixed
by the statute for charitable purposes, this court should enforce
that policy, and thus prevent any man or set of men from accom-
plishing indirectly what could not be accomplished directly. It
will probably be admitted that if, during the lifetime of Mr. Pearson,
a corporation had been duly organized under the laws of this state
for the purpose of holding property and of expending the income
thereof "for the benefit of the poor and destitute in the state of
New Hampshire and for charitable and educational purposes
therein," such a corporation could not hold property exceeding in
value the sum of five hundred thousand dollars without special
authority from the legislature, if it admitted that a division of
profits among its stockholders or members was not one of its
objects.

The legislature of New Hampshire has declared, in effect and in substance, that it is contrary to the policy of the law of this state to permit any single set of individuals to hold property in perpetuity in excess of the amount of five hundred thousand dollars for charitable purposes. There is far more reason for limiting the amount in the case of a set of individuals who are not incorporated, than in the case of a set of individuals who are incorporated. The powers of the set of individuals who are incorporated are expressly limited and restricted by law, and the legislature can at any time add new limitations and new restrictions, in accordance with public policy and the necessities of the case; but a set of individuals who are not incorporated have no limitations or restrictions upon their powers, except such as are imposed by the instrument creating the trust. In this case there are practically no limitations or restrictions upon the power of the set of individuals who are to perpetually hold and handle this particular fund. The sole limitation which it can be claimed is placed upon them by the will is that the income of the entire fund shall be used, whenever it is used at all, for charitable purposes only.

*Eastman & Hollis, George W. Stone, John S. H. Frink,* and *John M. Mitchell,* for the defendants.

BLODGETT, C. J.   The issue between the parties is upon the validity of a bequest for the creation of a charitable trust by the will of the late John H. Pearson. The plaintiffs ask that the bequest be declared void, and the executors pray the advice and direction of the court as to their duties in the premises.

In the first instance, the parties disagree as to the meaning of the language used by the testator. The clause in question commits the residue of the estate to three trustees, "*to expend,* in their discretion, in such sums, at such times, and in such manner as may seem to them advisable, *the income* of my said estate, . . . for the benefit of the poor and destitute in said state of New Hampshire, and for charitable and educational purposes therein." The contention arises upon the meaning of the words "in their discretion." On the one hand it is urged that they mean a discretion to expend or not to expend, and on the other, that the intent was to allow the trustees to exercise their judgment only in the details of the execution of the declared purpose as to the use of the income. The latter is manifestly the true construction. The trustees are specifically and imperatively enjoined to expend the income. The will is not "to expend the income or to add it to the principal, in their discretion." There is nothing in the language of this item, or in the will as a whole, or in any particular part thereof, evidenc-

ing any such purpose. If there had been such a design, the will would somewhere furnish evidence of it. Not only is this so, but by italicizing, as he did, the words "to expend" and "the income," the testator plainly emphasized his purpose and clearly set forth what he had in mind. He intended a present and continuing public benefaction; and the means he chose by which to accomplish the end in view was the expenditure of the income of this property by these trustees and their successors. The construction contended for by the plaintiffs is technical to an extreme, and leaves wholly out of view the connection in which the words were used. The expressions, "in their discretion, in such sums, at such times, and in such manner as may seem to them advisable," were all inserted to make sure that the trustees should be left unhampered in the administration of the trust, within the specified limits. None of these words were used for the purpose of giving the trustees power to defeat the object the testator had in mind. The discretion given is as to the manner of spending, and not as to spending or withholding. The command to expend the income is plain and easily understood. It leaves nothing to implication upon the question of the imposition of a positive duty. Upon this point we cannot but regard the evidence as persuasive, convincing, and decisive against the plaintiffs' contention.

The other grounds advanced for holding the devise invalid are, in the main, but various forms of the proposition that the whole scheme is too vague and indefinite to be capable of enforcement in a court of equity. It is argued that "the estate is hopelessly indefinite," in that there is no specification of what portion thereof shall go to each object. If this objection is of any force, it is not because the estate is uncertain, but because the beneficiaries are not definitely pointed out. It is evident that the income of the estate, after the payment of a small number of clearly defined charges, is a sufficiently specific subject-matter upon which to impose a trust. It is no objection to the validity of a charitable gift that it is made up of several parts which are to be administered together, the income to be divided according to the discretion of the trustee. *Webster* v. *Sughrow*, 69 N. H. 380, 383; *Gafney* v. *Kenison*, 64 N. H. 354, 357.

The next, and apparently the principal, objection of the plaintiffs is that the objects of the testator's bounty are too indefinite; that the plan of distribution is so vague that it would be impossible for a court to determine whether it was executed as the testator intended, and therefore it cannot be carried out. But this argument is based upon a radical error. It assumes that the testator had in mind certain and definite beneficiaries, and that the court must be able to see to it that the property goes to them. Starting

with this false basis, the whole argument is erroneous or inapplicable. What was the testator's intent? What did he have in mind when he made this will? What is the purpose which the court is to see that the trustees fulfill? What is it that the trustees are to be supervised in the execution of? Not details of distribution. Not the conferring of this sum on such a school, the giving aid to a certain poor widow, or the endowment of a free bed in a given hospital. The testator did not express any such *minutiæ* in this will. They formed no part of his intent. What he intended was that these trustees and their successors should expend this income for such of certain specified charitable objects as to them seemed most worthy. This was his thought, as evidenced by his act. This, and this only, is the intent to be carried out. There is no practical difficulty in performing the judicial act of determining whether this intention is carried into effect, and the trust is not to be held invalid on this ground. "There is a wide distinction between a gift to *charity* and a gift to a *trustee* to be by *him* applied to *charity*. In the first case, the court has only to give the fund to charitable institutions, which is a ministerial or prerogative act; in the second case, the court has jurisdiction over the *trustee*, as it has over all trustees, to see that he does not commit a breach of his trust, or apply the funds in bad faith, or to purposes that are not charitable." 2 Per. Tr. (5th ed.), s. 719.

It is apparent that this distinction is well grounded in reason. The objections to vague and indefinite trusts for charity are that the courts cannot surely determine whether they are duly executed by the trustees in accordance with the intent of the donor; and that, in the absence of a trustee, the court cannot perform the ministerial act of dividing the gift among various beneficiaries. When these objections are avoided, there is no occasion to defeat the meritorious purpose of a testator. It is to be borne in mind that the rule as to declaring indefinite trusts void has not been put upon any ground of public policy. They are declared void because the nature and functions of courts are such that there is no power to carry out the aims of the donor. When the case is such that the purpose may be effectuated by a decree plainly within the power of the court to make, the trust must be upheld.

It is the failure to apply this test that has led to a few erroneous decisions. These cases are predicated upon the failure to note that in such event the whole duty of the court is performed by seeing that the trustee applies the fund to uses within the designated class. It might be impracticable for this court to make a decree dividing the income of the fund in the present case; but no obstacle appears to prevent a speedy determination of any dispute which might arise in respect of whether the trustees were

exceeding their powers. The remark of the Connecticut court in a somewhat similar case is applicable here: "The class to be benefited is a large one, for the testator has imposed no restrictions as to race or residence, but the number of possible beneficiaries under a charitable bequest is immaterial where a power of selection is given." *Woodruff* v. *Marsh*, 63 Conn. 125, 129. "In all charitable uses, or nearly all, the persons ultimately to be benefited by the charity are uncertain, they are only to be ascertained by the general purpose; and if that be indicated sufficiently to bind the conscience of the trustee, as it is said, it is enough." *Derby* v. *Derby*, 4 R. I. 414, 437. "If the general object of the bequest is pointed out, or if the testator has fixed the means of doing so by the appointment of trustees with the power of selection vested in them, then the gift must be treated as sufficiently definite for judicial cognizance and will be carried into effect." *Bullard* v. *Chandler*, 149 Mass. 532, 541; *Darcy* v. *Kelley*, 153 Mass. 433.

The general American rule is substantially the same. *Hesketh* v. *Murphy*, 35 N. J. Eq. 23; *Erskine* v. *Whitehead*, 84 Ind. 357; *Miller* v. *Teachout*, 24 Ohio St. 525; *Sowers* v. *Cyrenius*, 39 Ohio St. 29,— 48 Am. Rep. 418; *Hunt* v. *Fowler*, 121 Ill. 269; *Quinn* v. *Shields*, 62 Ia. 129; *Clement* v. *Hyde*, 50 Vt. 716; *Fox* v. *Gibbs*, 86 Me. 87; *Howe* v. *Wilson*, 91 Mo. 45. "An examination of the authorities generally will show that in modern times instances of testamentary gifts being rendered void for uncertainty have been of much less frequent occurrence than formerly, and the courts are now quite uniformly reluctant to admit uncertainty as a ground for avoiding the formal disposition of property." *Gafney* v. *Kenison*, 64 N. H. 354, 356.

It follows that the question of the royal prerogative, which has been so extensively discussed by the plaintiffs, is not here involved. Conceding that there is such a power, as distinguished from the general equitable jurisdiction over trusts, and that it is not to be exercised by this court, the result here is not affected. There has been no failure of the scheme of the testator. The plan is for the trustees and their successors to exercise a continuing discretion, within the prescribed limits. The expression of the idea is not imperfect. The bequest belongs to the class " of indefinite trusts where the trustees must exercise a continuing power and discretion in the selection of objects of the charity. Successors to the trustees appointed in the will . . . would have the right to exercise the power from the clear intent of the testator." 2 Per. Tr. (5th ed.), s. 721.

For the same reasons, it is unnecessary to examine the *cy pres* doctrine. The method of carrying out the testator's purpose is to be that laid down in the will. Whether a new method would

be devised if that one should fail, is a question which is entirely immaterial as the case now stands.

It is also urged that this trust must fail because there are no specific beneficiaries pointed out in the will. The claim is that there must be some one capable of enforcing the execution of the trust, and if no one is named in the will the trust cannot be executed. It is true that cases may be found which uphold such a rule. It appears to be. the law of New York and some other states. Its practical effect is to abolish all charitable trusts. Indefiniteness of beneficiaries is an essential element of a charitable use. *Russell* v. *Allen*, 107 U. S. 163. The benefit is not for specified persons, but for the public. If there is a breach of trust, the public can appear through its appointed' officers. This rule is in force here to such an extent that no decree affecting such public right is effective unless the attorney-general is a party to the proceedings. *Rolfe and Rumford Asylum* v. *Lefebre*, 69 N. H. 238, 240, and cases cited. The means for enforcing the trust are ample. The rights are not individual, but public, and are to be protected by those whose duty it is to conserve the public interest. Any other construction would " subvert the foundation of all public charity." 2 Per. Tr., s. 732.

The plaintiffs also insist that the cases in several jurisdictions decide that a bequest like that under consideration is void, and that there is no case to the contrary in this state. It is conceded that there are such decisions, but they depend largely upon local statutes. Those which hold that a gift like this is too vague, that it is not enforceable because there is no certain beneficiary, and that it violates the rule against perpetuities, all depend upon the proposition that the statute of 43 Elizabeth, chapter 4, is not in force, and that there is no other source of equitable jurisdiction over trusts for charities. This is the position taken in New York. The statute of Elizabeth was there repealed in 1788, and the construction placed upon the repealing act was that if there had been equity jurisdiction over charities before the statute of Elizabeth was enacted, it was the intent of the legislature to take it away by the repeal of 1788. *Levy* v. *Levy*, 33 N. Y. 97, 110; *Bascom* v. *Albertson*, 34 N. Y. 584, 602, et seq.; *Holland* v. *Alcock*, 108 N. Y. 312, 336. The New York view obtains in Virginia (*Gallego's Ex'rs* v. *Attorney-General*, 3 Leigh 450,— 24 Am. Dec. 650), in Maryland (*Dashiell* v. *Attorney-General*, 5 H. & J. 392,— 9 Am. Dec. 572), in Michigan (*Methodist Church* v. *Clark*, 41 Mich. 730), and in Minnesota (*Lane* v. *Eaton*, 69 Minn. 141,— 38 L. R. A. 669), but has apparently ceased to obtain in Wisconsin. *Harrington* v. *Pier*, 105 Wis. 485,— 50 L. R. A. 307. These are the states upon whose decisions the plaintiffs chiefly rely. Depending, as these

decisions do, upon local statutes for their force and effect, it is quite unnecessary to argue that they are valueless here. Cases from jurisdictions where the legislature has reduced charitable bequests to the level of legacies for private purposes throw no light upon the question of what constitutes a valid charity at common law. The plaintiffs' authorities are substantially all from states which, in effect, deny the whole doctrine of charitable trusts. From the first, such trusts have been recognized in this state, both in the decisions of the courts and the acts of the legislature. *Union Baptist Society* v. *Candia*, 2 N. H. 20; Laws, ed. 1830, *p.* 510; *Duke* v. *Fuller*, 9 N. H. 536; *Webster* v. *Sughrow*, 69 N. H. 380, and cases cited.

There is no statute in this state repealing the statute of Elizabeth; and the rule here is that, whether it has been adopted or not, "courts of equity have original and inherent jurisdiction over charities, independent of the statute." *Goodale* v. *Mooney*, 60 N. H. 528, 533; *Webster* v. *Sughrow*, *supra*. Furthermore, so far as the common law has been declared in this country, it has been held with substantial unanimity that such a trust as that under consideration is valid. 2 Per. Tr. (5th ed.), *s.* 748, and authorities there reviewed; 5 Eng. Rul. Cas. 575–580, American notes.

The claim is also advanced that the power to devote the income to educational purposes is too broad, that it would allow the trustees to apply the fund to purposes not charitable, and therefore the whole gift is void. "In the case of a charitable gift above all others, it is often said, the construction should be such as will preserve rather than destroy the gift." *Goodale* v. *Mooney*, *supra*, 534. It is undoubtedly the law in most states that where property is given to trustees, with power to apply it either to uses which are or those which are not within the classes included in charities, the whole must fail, so far as the application of the peculiar doctrines of charitable uses is concerned. *Stratton* v. *Physio-Medical College*, 149 Mass. 505. But that is not the present case. The gift is to educational purposes. It is not for the private gain of those who are engaged in educational work. A bestowal of the income upon the owners of a school conducted for private gain would not be putting it to a charitable use. Neither would it be an application thereof to educational purposes. Such a gift would enrich the educator, or the owners of an educational enterprise, but would not promote education in the sense intended by the testator, and is not within the power conferred upon the trustees. To come within the fair meaning of the phrase "for educational purposes," the use must be one which directly promotes the cause of education. This is a charitable use. *Jackson* v. *Phillips*, 14 Allen 539.

The trust created by this will contains all the requisites of a

valid charity, as set forth in *Goodale* v. *Mooney*, 60 N. H. 528, 533. The words are imperative. The testator places the property in the hands of the trustees, with directions to care for and invest the same, and distribute the income. "The subject is the remainder of his estate and is certain." The object is the relief of the poor and destitute in the state of New Hampshire, and for educational and charitable purposes therein. The individual beneficiaries are uncertain, as they must always be in the case of a charitable trust; but the objects are clearly defined, and there can be no difficulty in determining whether a given purpose comes within the prescribed classes. "The class is certain, and the individuals to be selected from it may be made as certain by the election of the trustees. Were no mode of selection pointed out in the will, there might be force in the objection; but there is a mode. The beneficiaries are to be selected by the trustees, and when selected are to enjoy the charity in greater or less proportions from year to year, or in such form as the trustees may think best." *Treat's Appeal*, 30 Conn. 113, 116.

Finally, it is contended in the plaintiffs' behalf that the statute limiting the power of non-dividend-paying voluntary corporations to hold property (P. S., *c.* 147, *s.* 8) should lead to a decision that these trustees cannot hold a larger sum. The arguments advanced in support of this novel claim might with propriety be urged upon the legislature as reasons why the statute should be made applicable to all eleemosynary trustees, but they have no application here. Perhaps it would be better if the law were as the plaintiffs claim it should be; but the sufficient answer here is that the legislature did not entertain such views.

The plaintiffs' bill should be dismissed. The trustees should be advised, upon the settlement of their account as executors, to proceed with the execution of the trust, distributing the residue of the income of the property among the specified classes of beneficiaries. They are to make the division as to them seems best. If doubt shall hereafter arise as to whether a proposed object is within the classes specified, further advice can be had upon application. *Gafney* v. *Kenison*, 64 N. H. 354, 357. If any one desires to make complaint concerning the acts of the trustees, proceedings can be instituted through the intervention of the attorney-general. *The Dublin Case*, 38 N. H. 459.

*Case discharged.*

All concurred.