In the Matter of the Estate of EDWARD W. BROWNING, Deceased.

Surrogate's Court, New York County, January 6, 1938.

*Daniel A. Shirk* [*Daniel A. Shirk, Milton A. Goldiner* and *Edwin R. Wolff* of counsel], for Dorothy Browning Hood, petitioner.

*Joseph V. McKee* [*Casimir J. F. Patrick, William T. Griffin* and *Gilbert Lazerus* of counsel], for the trustee, Title Guarantee & Trust Company.

*John J. Bennett, Jr., Attorney-General* [*Robert P. Beyer, Assistant Attorney-General,* of counsel].

Delehanty, S. This proceeding presents for decision the question whether the plan of the testator for disposing of his residuary estate is valid and also presents the question whether or not the provision for his daughter constitutes an annuity in her behalf. A subsidiary question is presented whether or not the

daughter may elect to take the capital value of the annuity if it be held that the provision in the will constitutes an annuity provision. For a full understanding of the questions presented it is necessary to state the lengthy provisions of the will and codicil which affect these questions.   Deceased provided in his will:

" *Third:* All the rest, residue and remainder of my estate, real and personal, I give to my Trustees hereinafter named in trust as follows: To take possession of all my real and personal property and to manage the same and to invest and keep the same invested and to collect the income from all my real and personal property and all securities and investments and, in their discretion according to the directions hereinafter given, to sell such real and personal property and any investments and securities of my estate and re-invest the proceeds in such securities as may seem to them desirable.   Out of the income of my real and personal property my Trustees shall pay all taxes, assessments, interest on mortgages and shall pay for such repairs, improvements or other expenses as may seem to them necessary or desirable in connection with all the real estate which may form part of the trust hereby created. Ten per cent. (10%) of the net income shall be used by my Trustees to pay such mortgages or portions of such mortgages as they may select for such payment until all mortgages are paid off and thereafter shall be applied to improvements or used for investments in the discretion of my Trustees.

" The remainder of the net annual income shall be divided into six equal portions or shares and each such portion shall be devoted in each year as a prize for the best results achieved during such year in the six classes hereinafter specified and shall be paid to such man or woman throughout the world, or, in case it may so transpire, to such organization, as upon the decision of my said Trustees shall have accomplished preeminent results in each class.   The six classes or purposes above referred to, and to be known as the Browning Prizes, are as follows:

" *a:* The prevention of cruelty to children or animals, or the promotion of peace and international harmony.

" *b:* The spreading of the Gospel under Protestant auspices, either by distinguished example, effective teaching or exceptional personal service.

" *c:* The uplifting of the moral conditions of the world, either by some direct and positive service or example to that end, or by the introduction or furtherance of methods most successful in decreasing vice, gambling, intemperance; or dishonesty and corruption in government and politics.

" *d:* The production of the most serviceable invention or useful discovery; or architectural improvement in fireproofing and sanitation or otherwise; or the most important work of art in painting, sculpture or literature.

" *e:* The most widely beneficial discovery or new method in medicine, surgery or in the prevention of disease.

" *f:* The increased production or improvement of fish, birds or animals; the conservation of forests; the irrigation of arid lands; the increase or improvement of crops, flowers or plants.

" If in any year the said Trustees shall deem it advisable to withhold the awarding of any prize on account of lack of preeminent merit in any class, or for any other reason, the share of the income which would have been devoted to such class for such year shall be divided equally among the other classes or prizes for such year; and in any classes where two or more persons shall have executed any work or attained any result in conjunction or collaboration, the prize for that year shall be equally divided among them, or the Trustees may divide the prize for such class among the various purposes within such class, if they shall deem best to do so. I desire, however, that the prize for each class shall be awarded at least once in any consecutive five years.

" It is my desire that the said Trustees shall have full power to adopt any method for the regulation of their proceedings, for the prosecution of any researches or the collection of any facts or data or in reaching their determinations, hereunder, as may seem to them desirable.

" My purpose in the establishment of the trust hereunder is to promote the well-being and happiness of humanity by stimulating an interest in and a competition to achieve those religious, moral, social, economic and intellectual improvements which seem to me most important.

" While requesting the said Trustees to have in view this general purpose, I do not wish to limit or confine their judgments or proceedings, and desire that in estimating and valuing contributions to human welfare they shall apply any criteria, tests or verifications as may seem to them best. Such contributions as may have utility in a limited field only need not necessarily be considered of less importance than those whose effect may be more wide spread, nor need greater importance necessarily be attached to those measures, plans or suggestions or to those accomplishments which indicate a more permanent influence as against those offering more immediate or transient benefit. The discretion of the trustees hereunder shall be in no way or manner restricted.

" The said Trustees shall have full power to construe any provision of this Will relating to their duties or decisions·as to which my intention may appear uncertain or ambiguous.

" No award shall be made for the work of any person unless such person shall be living at the time of such award.

" No award shall be made for any work of literature unless the same shall have been published or printed for general circulation.

"*Fourth:* The said Trustees shall consist of seven persons, as follows: (Naming them.)

" The decision of a majority of the Board of Trustees at any time acting hereunder shall be sufficient as to any purpose under this Will and the signatures of a majority of the Board of Trustees at any time acting hereunder shall be deemed legally sufficient upon any deeds of conveyance or upon any documents or papers which may be executed in carrying out the provisions and purposes of the trust hereunder.

" In case of the death or resignation of any of said Trustees before or after my death, such vacancy may be filled by a majority vote of the remaining Trustees. In case at any time the said Trustees should be so divided in judgment as seriously to interfere with the proper execution of the trust, or in case of any charge made against them by a party in interest, any person concerned may refer the same to the Justices of the Appellate Division in the First Department of the Supreme Court of the State of New York as individuals and said Justices are hereby authorized to decide the issue or question raised or to recommend the removal of one or more Trustees, and a decision of a majority of them shall be final, but if for any reason the said Justices of the First Department shall not make such decision the question at issue may in like manner be referred for decision to the Justices of the Appellate Division in any other Department of the Supreme Court of the State of New York.

"*Fifth:* I empower said Trustees to employ such officers and agencies as they may deem necessary and to fix their compensation. These will properly include a Secretary and a Treasurer, which latter may be a Trust Company should my Trustees so elect. The said Trustees should create Committees of their own number to forward their work. They should meet periodically and at least once a year.

" Such Trustees shall serve without compensation, but their necessary expenses including all expenditures herein authorized shall be paid by them out of the net income of my estate, and also a small honorarium for attendance at meetings as is customary with Boards of Directors.

"*Sixth:* The decision of the Trustees awarding the Browning Prizes for each year shall be made on or before October first and on the sixteenth day of October, the birthday of the testator, which shall be known as Founder's Day, the said Trustees shall make known the results of their awards and shall thereupon pay over to the nominees the awards to which they shall be respectively entitled, including in each case a medal or other trophy or memorial of the value of Two Hundred and Fifty Dollars, bearing the testator's effigy and a suitable inscription."

The quoted text presents basis for the usual controversy between distributees and those interested in sustaining trust provisions as valid. The trial court here has the task of ascertaining whether or not there exists in the wordy passages quoted above the vice of illegality upon which the sole distributee of the deceased relies to defeat the testator's declared purposes. The brief submitted by her counsel is exhaustive. It follows of necessity the usual line of argument. It asserts that because absolute discretion is vested in the trustees they would be able to devote the trust property to personal, private and selfish purposes. The brief says in substance that the actual underlying purpose of the testator was the perpetuation of his name, and that he was desirous primarily of accomplishing that result whether in its accomplishment benefit resulted to the general public or to individuals. Subsidiary to the main argument thus sketched is the argument that the payment of trust proceeds as a reward or prize constitutes devotion to a noncharitable use unless the work for which the prize is awarded itself is limited to such as comes within the description of a charitable use. It is argued that there is in this will no such limitation on the trustees.

Both the trustee and the Attorney-General argue that the general charitable purposes of the testator permeate his whole gift, and that the argument based on the possible benefit to individuals ignores that fundamental purpose, and so is not entitled to weight.

The familiar controversy is thus sufficiently stated. If this court were to adopt a rule of strict construction and were to seek for basis upon which to avoid this gift it may well be that that text can be found in the will which, in the letter, if not in the spirit, would justify such a construction. As might have been expected, the case of *Matter of Shattuck* (193 N. Y. 446) is cited by the attorney for the distributee. That case recurrently plagues the trial courts when they are construing particular language of a testator. It has been " limited to its particular facts," its authority " has been shaken," but it has not been overruled nor has it been declared to be a statement of an outmoded approach to the social question

which is involved in gifts for charitable use. Its text says (p. 456): " In this will the testatrix, without defining the use to which the income of the trust fund is to be applied, directs generally that it be paid over to such particular ones of certain institutions as in the judgment of the trustee seems advisable. The power of the court to control the trustee is bounded by the directions of the testatrix. It cannot add to or take from the terms of this will properly construed any more than it could if the testatrix had specified by name the particular institutions entitled to the income of the trust fund, and she had included among them one or more manufacturing or transportation corporations. The *possible* devotion of the income of said trust in whole or in part to private use *necessarily* affects the *entire* gift and *requires* that the same shall be held invalid." (Italics supplied.)

When and if the occasion shall present itself to our highest court in such form as will permit that court to restate the policy of the law of charitable gifts, such statement of general principles, if made, will aid the work of the lower courts. The quoted text from *Matter of Shattuck* seems to reach back to a time when there existed a social reason for restriction upon charitable gifts generally. The case emphasizes the point of view which once predominated in the judicial consideration of charitable gifts. In *Levy* v. *Levy* (33 N. Y. 97 [1865]) the court, after arguing that article 35 of the Constitution of 1777 did not bring the English law of charities into New York State, proceeded to point out that by the Mortmain Act the English themselves had limited the creation of charitable uses. After describing the development of relevant legislation in New York State, the court remarked that this development " indicates that the policy, from the foundation of the government, was to confine within certain and narrow limits the accumulation of property perpetually appropriated, even to charitable and religious objects " (p. 111). Discussing the early economic development of the State, the court said (pp. 115, 116): " It was important, at that early time, that the property of the State should not be largely withdrawn from general and devoted to special uses, even though the latter was the founding and endowment of institutions of useful learning and true piety, or setting on foot truly benevolent schemes for ameliorating social evils; but it was of the last importance then, and ever will be to the public interests and welfare, that such property should not be withdrawn from circulation, and the general uses of society, for promoting objects, public in their nature, unsanctioned by the legislative power, and which may be in themselves the offspring of the grossest ignorance, caprice and folly. * * * Our legislative department, in every stage of the govern-

ment, has recognized the obligation to encourage learning and piety, and all objects truly benevolent and charitable. To repudiate a system of public charities, originating in and enforced under another form of government, civil and ecclesiastical, and adapted to the state and condition of society therein, was not surprising. It was palpably incongruous with our political system and the principles that lie at the basis of our government and institutions; not adapted to our social condition, and impracticable of execution. But ' the great law of charity ' was to be saved, whilst it was preserved from alliance with gross and degrading forms of error and folly. The policy and system adopted for effecting this end has steadily looked to keeping the subject, at all times, under legislative control and restraint."

This opinion was delivered by WRIGHT, J., who had expressed himself in similar vein fifteen years earlier in the case of *Yates* v. *Yates* (9 Barb. 324, 333). In *Bascom* v. *Albertson* (34 N. Y. 584), PORTER, J., voiced like views, saying (at p. 605): " They [our forbears] were engaged in founding institutions appropriate to a free State, and in cutting loose from such as had proved, in the mother country, beneficial to class interests, but hindrances to the prosperity of the general mass of the community. They had been warned by the experience of their ancestors, that *the free alienability of property is as essential to the healthful condition of a State as the flowing of the tides to the purity of the sea, or the circulation of the blood to animal life.*" (Italics supplied.)

No doubt the judicial policy expressed in the decisions which pointed out the need for keeping free for new investments all the available capital in this country was in accord with the individualism of a pioneer age. Freedom of movement of money was a desirable thing at a time when this nation was developing its resources and was financing the march of population from the eastern seaboard to the west. When, however, the horizontal march of development had become substantially complete and the population of the country had reached substantial equilibrium there arose the need for a more intensive and, in a sense, a vertical development of our resources which required the fixation of funds and their intensive use in areas such as large centers of population suitable for that vertical development. As a concomitant of the change from the rugged individualism of the pioneers, whose self-sufficiency set them on the road to adventure, there arose an urban and static population which depended for existence largely upon the combination of their own services with the services of others. With this development arose the need for public aid in times of stress. In such large centers the population has neither the resources nor the training

which enables them to help themselves. The growth of large communities and the large shift of population into urban centers gave rise to many problems of public welfare which theretofore had not been acute. In chapters XXIII and XXIV of the report of the social scientists who were asked in 1929 by President Hoover to make a national survey of social trends in the United States there will be found a comprehensive discussion of social work privately supported and of public welfare activities. The studies made are exhaustive and constructive. (Recent Social Trends in the United States, pp. 1168–1273, McGraw-Hill Book Company, 1933.) The studies show the huge growth of community chests, community trust funds and philanthropic foundations operating under special statutes. The 1937 report of Carnegie Corporation of New York presents interesting statistics of the growth of foundations and the enormous disbursements which are made from such foundations in fields which might seem at first glance not to be "charitable." In the aggregate their efforts have operated to the advantage of the public and in a marked degree the results of the expenditures of the foundations have benefited the common man and ameliorated his lot. The extent of the field covered by these expenditures may be gathered by examination of the schedules appended to this report of the Carnegie Corporation.

The shift from the emphasis on the individual and his responsibilities which marked the earlier period of our government to emphasis on community responsibility is very great indeed when looked at in the concrete evidences of governmental intervention in fields which heretofore have been regarded as adequately covered by the efforts of private charity. Economic conditions have constrained alteration in the public point of view respecting such governmental intervention. What was once generally regarded with dread and suspicion has of necessity been accepted as standard. That alteration of viewpoint would seem to leave little of basis to the factors which seem to have governed the decisions of the nineteenth century respecting charitable uses. Then it was believed that the perpetual maintenance of large funds in private hands was fraught with grave threat to the public weal even though the purposes were charitable. Such funds were conceived to be concentrations of power. The permanence of the fund was deemed to be so decided a peril to citizen control of the community's activities as to call for the utmost strictness of regulation. It was natural that the current decisions of that day tended to the destruction of such trusts as incompatible with the spirit and genius of our free institutions. These decisions conformed to the political concept then extant that to withdraw any property from the hazards of

gain and loss was to confer on it a privileged and even dangerous condition — dangerous because calculated to introduce a stratification of classes abhorrent to the democratic order. The removal from the marts of commerce of large amounts of property was not congruous with the spirit and ambitions of the period which made heroes of men who, with initiative, ingenuity and sometimes ruthlessness had gained stature politically and socially because they had gained large fortunes.

The passage of the Tilden Act removed a chief basis upon which trust provisions in wills had been stricken down theretofore. Despite the legislative policy declared in that act the courts still were influenced by the political and social ideas of their time and still sought basis for avoiding charitable gifts. The explicit reasons given by the court in the *Shattuck* case for holding void the scheme of the will there under scrutiny have had so little appeal to the appellate judges of recent decades that the decision in the *Shattuck* case has been kept in a kind of isolation ward. But on its facts it stands apparently for this: A trust scheme for devoting the income of a fund to " religious, educational or eleemosynary institutions " is void because of " the *possible* devotion of the income * * * to private use." (Italics supplied.) Have the more recent decisions of our Court of Appeals changed the rule quoted in the *Shattuck* case? Is it now time to say in general terms that the courts should *first*, search to see if a charitable purpose dominates the gift and, *second*, validate such gifts if such fundamental purpose is found even though there be *incidental possibilities* of " private use ? "

In the supply to the under-privileged of the mere necessities of life (which is charity's greatest task) is not face-to-face, personal and private charity far better than any public charity could be? Is not the beneficiary of such private charity encouraged to stand on his own feet and to rehabilitate himself? Is he not encouraged to a stability of citizenship by reason of his experience of the humaneness of his fellows? It is common knowledge that toward public charity the beneficiary soon adopts the attitude that it is owed to him. The deadening effect of a public dole has been shown in the willingness of thousands to surrender their freedom and their responsibility in exchange for public assurance of maintenance. In other countries the surrender of individualism has reached the point where whole systems of government are based on a collectivism by whatever name it is called. In our day and in our country a movement in this direction is perceptible, though the time has not yet arrived when an American Juvenal can say that the people seek only for " *panem et circenses*." Enough has been witnessed, how-

ever, to mark so definite a change in social outlook toward charitable gifts as to render wholly outmoded the social concepts which are found in the early decisions. At least it can be said now that all of the dangers to the moral life of the community adverted to in the earlier cases as being attached to charitable funds have their counterparts a hundred fold magnified in the devotion of public funds through public agencies to charitable purposes. The salvage of the American ideal will be difficult if the principle of subsidy overshadows the principle of private charity. There is reason now to approve charitable foundations as serving the public good because they restore to better balance the relationship of the individual to his government. To the extent of its resources private charity will remove the temptation of the underprivileged to regard government as obliged to furnish support and will aid in the restoration of a sense of personal responsibility among its donees. Such private funds are not subject to bureaucratic administration. They never lose their character as true charity.

These private funds devoted to charity have another and important usefulness. They express a well-to-do donor's sense of obligation toward his community. They justify in a measure the large acquisition of property which the donors effected in their lifetimes. They teach that wealth to which is attached a sense of social responsibility is not dangerous. The making of such gifts stabilizes a community in teaching that the rich, after satisfying their private needs, are conscious of an obligation in large or in small degree to make public use of their surplus. When wealth and the wealthy are so regarded there is little temptation to the violent explosions which in other lands have been based in part upon this disparity in the possession of worldly goods. If it be sound so to interpret the social movements of the day it seems clear that a rule for decision which fosters charitable gifts is far to be preferred to one which deals critically with them. Presently, at least, liberality in enforcing the declared purposes of donors will serve a definite public good. In the unlikely event that such gifts will grow to dangerous volume legislative action will readily control them.

In the will here under consideration there are stated six purposes which animated the testator. In respect of most of them there can be no difference of viewpoint as to their truly charitable purposes. As to the fourth and sixth there might be controversy in an earlier day but, since the enormous investment of public funds in the areas covered by these declarations of the testator, there seems no basis to say now that such purposes are not charitable. This court will hold that each and every of the purposes declared is a charitable purpose and that the incidental directions respecting

the carrying out of the purposes so declared do not militate against their validity. In so ruling the court deems that it is following the liberal viewpoint expressed by our highest court in its recent decisions. Discussion of such decisions in detail will serve no useful purpose. Reference to them only is necessary. (*Matter of Durbrow,* 245 N. Y. 469; *Matter of Frasch,* Id. 174; *Matter of Robinson,* 203 id. 380; *Matter of Judd,* 242 App. Div. 389; affd., 270 N. Y. 516; *Matter of Hall,* 156 Misc. 841; affd., 272 N. Y. 428; *Butterworth* v. *Keeler,* 219 id. 446.)

The argument made that the plan of the testator is personal and private in that it is designed to perpetuate his name does not seem to the court to be of any substance. Whether man's desire to perpetuate his name be called vanity or be recognized merely as the aspiration of man to retain post-mortem some contact with the world he knew needs no discussion. Deceased has yielded only to an urge which is a human characteristic and which is evidenced in multitudes of public monuments and buildings. Surely that human motive can have no better expression than in the establishment of a fund for the amelioration of the lives of one's fellows or the betterment of man's lot. The ultimate recipient of the donor's bounty will no doubt receive the memorial " bearing the testator's effigy " without resentment. To most of the recipients, no doubt, it will add something to the reward because they will know the testator only in his character as a benefactor without knowing any of his human failings which might detract from the kindliness of his gift.

In 1930 deceased executed a codicil to his will dated in 1912. By this codicil he provided:

" In the event that I should predecease my child, Dorothy Browning, I direct that the trustees named in said Will shall set apart out of my residuary estate sufficient thereof to provide an income of Ten Thousand ($10,000) Dollars per annum until said Dorothy Browning shall have reached the age of twenty-one years and the sum of Twenty-five ($25,000) Thousand Dollars per annum during the remainder of her life.

" I bequeath to my child, Dorothy Browning, all my personal belongings, jewelry and effects, automobiles and all pictures, silverware, furniture and furnishings of any kind which may be contained in any apartment or dwelling used or occupied by me at the time of my death.

" And I hereby ratify and confirm my said Last Will and Testament in every respect save as far as any part of the same is inconsistent with this codicil."

Deceased's daughter was only fourteen years old at the time the codicil was executed. She attained her majority within the past year. She seeks here for a construction of the codicil to the effect that the testator intended to give her an annuity of $10,000 per annum until she became twenty-one years old and thereafter of $25,000 per annum until the end of her life. Assuming the gift to be an annuity she asserts that if the fund or property earmarked by the trustees proves insufficient in any year to yield the fixed amount to which she claims to be entitled she may look to the corpus of that fund to supply the deficiency, and if necessary she may cast upon the general estate the burden of satisfying the gift. Moreover, she claims the right to elect to take the capital value of the supposed annuity.

Because the language of the directory paragraph is obscure the remaining provisions of the will and codicil and the situation of the testator when the documents were executed have been considered in the effort to find out and to effectuate the intention of the testator. What a testator *says* may be incomplete, inaccurate, ungrammatical or obscure. To correct these faults the court, dealing with a will " may transpose words and phrases and read its provisions in an order different from that in which they appear in the instrument, insert or leave out provisions if necessary, but only in aid of the testator's intent and purpose." (*Tilden* v. *Green*, 130 N. Y. 29, 52.) In the present case it is necessary to insert new words into the codicil since the testator does not in so many words name any beneficiary, although it must be assumed that he intended his daughter Dorothy to benefit.

What words, then, are to be inserted and where are they to be placed? If the court interposes the phrase " for my daughter Dorothy Browning " between the words " income " and " of " the result will be an annuity — that is, the gift of a fixed sum to be paid yearly to the beneficiary. (*Matter of Gurnee*, 84 Misc. 324, 326; affd., 165 App. Div. 920.) On the other hand, if nothing is interpolated but the phrase " and to collect and apply the said income to her use and benefit " is *annexed* to the text the result will be an indestructible trust. One of these alternatives must be adopted. Neither of them conflicts with the other provisions of the will and codicil.

Considered from the standpoint of the testator's *expressed* thought, which insertion furnishes the slighter innovation? This question is important since the court must not construct a new will, but must content itself with occupying the subordinate role of one who prompts when the principal falters. To thrust into the paragraph the first suggested phrase is not exacted in consequence of any

syntactical weakness to be detected at the point of insertion. Nor is there any ambiguity in the meaning of the paragraph up to and beyond that point. Consequently, the phrase can be interpolated only at a sacrifice of the continuity of the testator's own expressed thought. On the other hand, to append the second suggested phrase would leave the testator's phrases undisturbed and would give full weight to them. When full weight is given to what the testator says it is evident that he has created not an annuity but a trust. It is true that he sets up the trust in outline only but all the elements are present. *Trustees* are mentioned and directed to act. Elsewhere in the will (which, with the codicil, constitutes a single instrument) they are named and endowed with ample investment powers. Concerning the existence of a *beneficiary* and her identity there can be no doubt when the text is viewed as a whole. Finally, a definite *trust fund* is set up. Although no *fixed amount* is named the testator states a rule for the ascertainment of the trust corpus.

It is argued by petitioner that the $10,000 and the $25,000 per annum mentioned by testator are the amounts which he wished the beneficiary periodically to receive in all events. This is to beg the question. What the testator *says* is that his trustees are to set apart out of his " residuary estate sufficient thereof to provide *an income* of $10,000 per annum " and later of $25,000 per annum. And the question is this: Do these figures serve *to measure the property to be set apart* from the residuary *or the amounts annually to be received* by the beneficiary? If the former, then the beneficiary is entitled to the income, whether small or large, produced by the capital invested. If the latter, then the beneficiary is entitled to the fixed sum prescribed whether the income be more or less than that sum.

The plan of the testator must be looked at against his background at the time the codicil was written. He had adopted his now surviving daughter and he had the desire to provide reasonably for her both during and after her minority. He had, of course, no means of knowing whether a fourteen-year-old child would develop a financial sense that would permit her to manage money in substantial amounts. If the testator be chargeable, as petitioner contends, with the intention to give to his adopted daughter an annuity, he is also chargeable in law with the knowledge that the capital value of that annuity would be payable on demand to his adopted daughter. If one looks at the mortality tables and finds that a fourteen-year-old individual has an expectancy of forty-six years, seven of which would be dealt with on an annuity basis of $10,000 and thirty-nine of which on an annuity basis of $25,000, it

is apparent that what is contended for is that deceased envisaged the transfer to his adopted daughter of a huge capital sum with no restraints upon her in the handling of it. (*Matter of Cole*, 219 N. Y. 435, 438.) The mere statement of the practical effect of what is contended for refutes the possibility that any such thought could have been in deceased's mind. So far from intending any such result he was clearly desirous of assuring a lifetime support for his adopted child on a basis sound and reasonable when her needs and his resources were taken into account. That her needs were taken into account is plain from the differential between the amount provided for her during minority and the amount provided thereafter. His resources seem to have been taken into account in the whole scheme of disposition of his estate because he quite apparently intended that after he had dealt liberally with the future of his adopted child he would still pursue the somewhat grandiose plan of charitable giving outlined in the will which he confirmed by his codicil. The measure which he adopted in directing the setting apart of the trust fund is not difficult to enforce by decree directing reservations of capital appropriate to the income requirements of the respective periods of infancy and adulthood. Deceased did not, in fact, know that if he were to prescribe annuity payments he was in law giving the capital value of the annuity outright to his beneficiary. Neither did he know in fact that the court had power to limit the fund during his daughter's minority to a level lower than that which would be required when she became twenty-one, or that the court had power to set up the maximum fund at once and direct that the excess income during minority of the daughter be paid to the holders of the next eventual estate. He probably considered his estate administration as a continuous process. In fact, that administration has turned out to be one of long duration because of the necessities of the situation. Deceased no doubt dealt with his desires for setting up the fund and paying the income therefrom on the basis of a business man's and not a lawyer's standpoint. The law, however, finds no difficulty in meeting his desires as he has expressed them. The fund to be set apart when the property reaches the hands of the trustees is a fund sufficient to produce a $25,000 income. From the general income of the estate between the date of death and the attainment of majority by the beneficiary she is entitled to have $10,000 annually. From and after her attainment of majority she is entitled to have from the general income of the estate $25,000 annually until the trust fund is in fact set up. Thenceforward she is entitled to have the income from the fund whether it be more or less than $25,000.

Whether the income of the estate is adequate for these payments will be determined in the accounting proceedings now pending. So, too, there must be determined in that accounting proceeding the remaining questions presented by the petition for construction. Until the finances of the estate are ascertained it will be impossible for this court to determine whether or not there has been violation of the limitations imposed by section 17 of the Decedent Estate Law. In the decree to be submitted in this proceeding all such questions will be reserved to the accounting proceeding. The undisposed of remainder interest in the fund is a part of the residuary estate. (*Matter of Cole*, 235 N. Y. 48, 56.) For the conclusion here reached respecting the intent of this testator as expressed in this will and codicil there is ample authority. (*Matter of Clark*, 251 N. Y. 458; *Spencer* v. *Spencer*, 38 App. Div. 403; *Matter of Velie*, 119 Misc. 15, 16; *Matter of Murphy*, 124 id. 672.)

Submit, on notice, decree construing the will in conformity with this decision.